[Civ. No. 5989.   Third Appellate District.—May 16, 1938.]

In the Matter of the Estate of WILLIAM REID, Deceased. MARGARET REID et al., Appellants, v. CARRIE REID, Respondent.

Henry J. Soldati for Appellants.

Karl Brooks for Respondent.

THOMPSON, J.—From a decree setting apart to the surviving widow a homestead, under the provisions of section 661 of the Probate Code, the brothers and a sister of the deceased have appealed.

It is asserted the finding of the court that the property from which the homestead was assigned was the community property of the deceased and his wife is not supported by the evidence.

William Reid died intestate in Sonoma County, December 19, 1935, leaving his widow, Carrie Reid, surviving him. They were married August 27, 1917. There were no children as the issue of their mariage. The decedent was survived by three brothers and a sister, who are the appellants in this case. Upon petition therefor, letters of administration of the estate of said deceased were duly issued. The estate consisted of real and personal property, including 7½ acres of farm land, being part of allotment No. 9 of the Rancho Roblar de la Miseria in Sonoma County, together with the dwelling house thereon. The widow petitioned the probate court to set aside to her, as a homestead, that tract of land with the dwelling house thereon. The brothers and sister of the deceased filed their opposition to that petition for a homestead, alleging that the land in question was the separate property of the deceased, and not the community property of the deceased and his surviving wife; that the proceeds from the sale of the land were previously devised by the will of their mother, Mary S. Reid, to the deceased and his said brothers and sister, as residuary legatees, share and share alike, and that in the course of probating the estate of Mary S. Reid, deceased, William Reid agreed to and did purchase the respective interests in said land from his brothers and sister on January 1, 1935, executing and delivering to them his promissory notes therefor, as follows: To Margaret Reid a note for $950.76, to John Reid a note for $838.46 and to David Reid a note for $351.16, which notes were not paid. Claims for these notes were subsequently regularly filed in the estate of William Reid, deceased.

At the hearing of the petition for homestead evidence was adduced in behalf of the respective parties. The court adopted findings determining that the real estate in question was the community property of the deceased and his wife, Carrie Reid; that the property, at the time of the death of

William Reid, was worth the sum of $6,275, and was then subject to a trust deed in favor of the Federal Land Bank of Berkeley, California, to secure an indebtedness thereon in the sum of $3,000, incurred by William Reid in his lifetime to construct the dwelling house on the premises; that the land was formerly owned by Andrew Reid, the father of William; that on October 26, 1928, Andrew Reid executed and delivered to William an agreement to sell the land for $7,000; that William Reid and his wife thereafter occupied and used the land; that prior to the death of Andrew Reid, which occurred August 21, 1930, William paid to his father on account of the purchase price of said land the sum of $1,000 from the community funds of himself and wife; that upon the death of Andrew Reid, his wife, Mary S. Reid, inherited from his estate, and there was distributed to her his entire property, including the unpaid portion of the purchase price of the land in question, represented by the contract of sale thereof, which then amounted to the sum of $6,000; that Mary S. Reid, the mother of William, then executed and delivered to him a written renewal of her husband's agreement to sell the real property, upon the same terms contained in the former instrument; that prior to the death of Mary S. Reid, which occurred March 8, 1934, William paid to his mother from the community funds of himself and wife the balance of the purchase price of said land, except the sum of $3,934.76; that subsequently William Reid borrowed from the Federal Land Bank of Berkeley the sum of $3,000 secured by a trust deed on said land, with which funds he constructed the dwelling house situated on the premises; that in settlement of the claims of his brothers and sister for their asserted interests in their mother's estate, William executed and delivered to them his promissory notes above mentioned, in consideration of which each brother and the sister executed and filed in July, 1935, in the estate of their mother, their separate written assignments of interest containing the following language: "I . . . do hereby sell, assign, transfer and set over unto William Reid, . . . all of my right, title and interest in and to the following described real estate."

The court further found that said payments were made by William to his brothers and sister in full settlement of their claims for their shares of the unpaid portion of the purchase price of the land, and that the assignments conveyed to Will-

iam all of their right, title and interest in and to the property which became and was the community property of William Reid and his wife Carrie, free and clear of all liens and claims, except the $3,000 trust deed which was held by the Federal Land Bank of Berkeley. On August 2, 1935, the probate court distributed in the estate of Mary S. Reid, deceased, to William Reid the entire fee in said 7½-acre tract of land, pursuant to the contract of purchase thereof and the assignments of interest therein. That decree of distribution merely confirmed the title to that land which was acquired by the original contract of purchase.

On submission of the petition for a homestead in the estate of William Reid, deceased, the court rendered its decree based on the foregoing findings, awarding the widow Carrie Reid a probate homestead on said 7½-acre tract of land, subject only to the trust deed to secure the $3,000 loan in favor of the Federal Land Bank of Berkeley. From that decree this appeal was perfected.

We are of the opinion the evidence adequately supports the findings of the court and the decree awarding the homestead to the widow, Carrie Reid.

In this case the evidence indicates that William Reid acquired title to the property in question from his father, October 26, 1928, by means of the contract to purchase it. At that time he and his wife had been married for eleven years. The presumption is that all property which is acquired during marriage, except that which is obtained by gift, bequest, devise or descent, is community property. (Secs. 164 and 687, Civ. Code; 3 Cal. Jur. Supp. 553, sec. 61; *Estate of Caswell,* 105 Cal. App. 475 [288 Pac. 102]; *Estate of Hill,* 167 Cal. 59 [138 Pac. 690].) It is said in the Hill case, last cited, that in determining whether property acquired by a husband is separate or community in its nature, the equitable status of a purchaser's title rather than the mere technical means by which the legal title is vested must control.

Under the circumstances of this case we are of the opinion the title to the land in question which passed to William Reid at the time he entered into the contract with his father to purchase it, vested in him so as to constitute community property upon which a probate homestead may be vested in the widow under the provisions of section 661 of

the Probate Code, free and clear of the vendor's lien to enforce the payment of the balance of the purchase price thereof. (*McClellan* v. *Lewis*, 35 Cal. App. 64, 68 [169 Pac. 436]; *Estate of Dwyer*, 159 Cal. 664, 675 [115 Pac. 235]; *Hunt* v. *Inner Harbor Land Co.*, 61 Cal. App. 271, 273 [214 Pac. 998]; *Longmaid* v. *Coulter*, 123 Cal. 208 [55 Pac. 791]; *Miller* v. *Waddingham*, 91 Cal. 377, 381 [27 Pac. 750, 13 L. R. A. 680]; *Kavanaugh* v. *Franklin Fire Ins. Co.*, 185 Cal. 307, 311 [197 Pac. 99]; 1 Tiffany on Real Property, 456, secs. 125, 127.)

In the McClellan case, *supra*, which involved the validity of a homestead vested on community property under a conditional contract to purchase the property, the court said:

"They [the purchasers] thereby became the equitable owners, and the vendor held the legal title merely in trust for said vendees. (*Baldwin* v. *Morgan*, 50 Cal. 585; *Gilbert* v. *Sleeper*, 71 Cal. 290 [12 Pac. 172].)" See *Orange Cove Water Co.* v. *Sampson*, 78 Cal. App. 334, 341 [248 Pac. 526], to the same effect.

In the *Estate of Dwyer*, *supra*, the same principle was declared in the following language:

"When a contract for sale of real property binding on the parties is executed, an equitable conversion is worked; the purchaser of the land is deemed the equitable owner thereof and *the seller is considered the owner of the purchase price.* The equitable conversion thus deemed to exist from the time a valid contract of sale is entered into may or may not be absolute. Whether it is, or not, will depend upon whether the terms of the contract of sale are subsequently complied with."

In the Hunt case, *supra*, it is likewise said:

"An executory contract to convey has the effect of vesting the equitable estate in the vendee, *leaving the vendor the naked legal title.*"

The nature and limitation of the title to real property retained by the vendor upon a contract for sale thereof, is declared by the court in the Miller case, *supra*, as follows:

"The fact that the vendor holds the legal title as security for such payment does not give him any greater rights than he would possess if he had conveyed the land and taken back a mortgage for the unpaid portion of the purchase-money, or than are held in land by a mortgagee who takes for his secu-

rity a conveyance absolute in form, instead of a formal mortgage.''

The nature of the title to land which is conveyed by means of a conditional contract of sale thereof is very fully and clearly expressed in 1 Tiffany on Real Property, page 456, sections 125, 127. It is there said in part:

''It is frequently said that on the making of an executory contract for the sale of land, of which specific performance would be decreed, a court of equity, regarding as done that which ought to be done, will consider the purchaser as the owner of the land. It is also frequently said that the vendor holds the legal title in trust for the purchaser, and occasionally the purchaser is said to be the trustee of the vendor as regards the purchase money.

''In support of the statement that equity regards the purchaser as the owner of the property, reference is ordinarily made to one or more of the following considerations. The purchaser may devise his interest in the property under the name of real estate or real property, it passes by descent to his heirs, and it is frequently subject to the dower rights of the wife.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

''On the death of the vendor the land passes to his heir or devisee subject to the obligation to which it was subject in the vendor's hands, to convey in accordance with the contract. On the other hand the right to receive the purchase money, being a personal chose in action, passes to the vendor's personal representative, and the heir or devisee, although he may be compelled, either by the purchaser, or the personal representative of the vendor, to make a conveyance to the purchaser, acquires no benefit from so doing.

''On the death of the purchaser, his right in equity to compel a conveyance of the land is regarded as passing *as land* to his heir or devisee, while the obligation to pay the purchase price devolves upon the personal representative, as the person liable on the contracts of decedent.''

From the preceding authorities we conclude that the land in question vested in William Reid and his wife, Carrie, as of the date when the contract to purchase it was originally made with his father, October 26, 1928, as their community property, so as to authorize the vesting of a homestead thereon.

Neither William Reid nor his wife acquired title to that land by inheritance. They acquired title thereto by purchase pursuant to the terms of the contract. All that they or their brothers and sister inherited from the estates of their father and mother, so far as the real estate was concerned, was the right to participate in the unpaid proceeds of that sale.

■ Appellants contend that William Reid did not acquire the equitable title to the land for the reason that he failed to fully pay the purchase price therefor prior to his death. That rule appears to prevail in some jurisdictions. (1 Tiffany on Real Property, 2d ed., p. 750, sec. 214.) In California and elsewhere, by the weight of authority, that is not the accepted rule. By the execution of a valid enforceable contract to sell real estate the vendee becomes the equitable owner of the title, subject only to be divested thereof for breach of the contract. In support of their contention in that regard, the appellants cite the case of *McClellan* v. *Lewis, supra.* It is true in that case the vendee did tender payment of the entire balance of the purchase price of the land. That tender, however, was not determined to have been a necessary condition precedent to the passing of an equitable title to the vendee. We do not believe the entire purchase price of real property must be first paid or tendered to the vendor to accomplish a conveyance of equitable title to the vendee under a valid conditional contract to purchase the land. As the California cases declare, all that the vendor retains under such circumstances is the bare legal title, together with a vendor's lien to enforce the terms of the contract, unless it is otherwise expressed in the contract.

■ Assuming that upon the death of a vendor of real property, which is subject to an incompleted conditional contract of sale thereof, the vendor's lien passes to his heirs, they possess no greater power by virtue of the lien than the vendor held, which is a mere personal privilege to enforce the lien in a proper action therefor. The lien may be waived by the acts or conduct of the vendor or his heirs indicating that they do not rely upon it to enforce the unpaid portion of the purchase price of the land. (*Royal Consolidated Min. Co.* v. *Royal Consolidated Mines, Ltd.,* 157 Cal. 737 [110 Pac. 123, 137 Am. St. Rep. 165].) The lien is not an absolute charge on the land. It is a mere personal privilege to resort to it if desired as a means of enforcing the terms of the contract.

(*Schwartz* v. *Mead,* 116 Cal. App. 606, 613 [3 Pac. (2d) 48];
17 Cal. Jur. 718, sec. 23.) In the authority last cited it is
said:

"A vendor's implied lien after conveyance is created by
the law and not by contract of the parties, as are mortgages.
It is not a specific and absolute charge on the land, but a mere
equitable right to resort to it upon failure of payment by the
vendee, that is, it is in its nature a personal privilege, un-
assignable, which the vendor can assert only in a suit brought
for the purpose of having it decreed and enforced."

In the present case there was no effort on the part of
the appellants to enforce their asserted vendor's lien, if in-
deed they did not deliberately waive it. They brought no ac-
tion to enforce it. On the contrary, they accepted the ven-
dee's promissory notes for their portions of the proceeds of
that sale of land and deliberately executed assignments of
their entire interests in that real property. They also filed
claims for those notes in the estate of their deceased brother.
Even though they retained their vendor's lien that would not
defeat the widow's right to a probate homestead on the prop-
erty. The most that could be claimed in a proper suit to
enforce such lien would be that the probate court should have
vested the homestead in the widow subject to the lien for the
payment of their unpaid portion of the purchase price of the
land. (*Longmaid* v. *Coulter,* 123 Cal. 208, 217 [55 Pac.
791].) There is no merit in that contention under the cir-
cumstances of this case.

We are of the opinion there is substantial evidence to sup-
port the finding of the court that the appellants had no lien
on the property, and that their vendor's lien was waived. It
is true that, in the absence of an agreement to that effect, a
vendor's lien is not waived by merely accepting from the
vendee his promissory note for the unpaid portion of the pur-
chase price of the land (25 Cal. Jur. 754, sec. 221; *Baum* v.
*Grigsby,* 21 Cal. 172 [81 Am. Dec. 153]), nor by filing in
the estate of the vendee a claim for allowance on that account.
A vendor's lien may be waived by acts and conduct incon-
sistent with a continuing claim therefor. (25 Cal. Jur.,
p. 751, sec. 218; 66 C. J. 1259, sec. 1157.) The appellants
deliberately executed and delivered to the vendee their writ-
ten assignments of all interest in their mother's estate on ac-
count of the sale of the land in question. That certainly is

evidence they intended to waive all further claims of liens upon that land.

The decree vesting a probate homestead in the designated land in Carric Reid, the widow of William Reid, deceased, is affirmed.

Pullen, P. J., concurred.