[Civ. No. 23966.   Second Dist., Div. Two.   Feb. 8, 1960.]

PALOS VERDES PROPERTIES (a Partnership), Respondent, v. COUNTY SANITATION DISTRICT NUMBER 5 OF LOS ANGELES COUNTY, Appellant.

Gordon, Knapp & Gill and Joseph C. Gill for Appellant.

Musick, Peeler & Garrett, John P. Pollock and Albert Mosher for Respondent.

KINCAID, J. pro tem.*—Defendant appeals from a judgment in an action for declaratory relief and for damages. The judgment ordered, adjudged and decreed that defendant be required by the terms of the July 1, 1955, agreement of the parties as amended, to accept the transfer from plaintiff of the latter's right, title and interest in and to that portion

---

*Assigned by Chairman of Judicial Council.

of the South Slope Trunk sewer line here in question and to pay to plaintiff the sum of $193,828.55, together with interest and costs.

Defendant, as a sanitation district of Los Angeles County, owned and operated sewer lines, with the usual appurtenances, and plaintiff is a land developer in the Palos Verdes area of said county.

In June, 1955, the parties decided that it was to their mutual interest to enter into a written agreement providing for the construction and acquisition of a trunk sewer line on the Palos Verdes Peninsula. It was to be known as the South Slope Trunk and was to connect with defendant's existing White Point Outfall facilities. Thereafter such an agreement was drafted by defendant and it was executed by the parties on July 1, 1955.

Because of defendant's lack of available funds and the mutual desire for early construction it was agreed that plaintiff was to advance the necessary money and would sell and transfer the sewer to defendant for a price equal to the total actual and direct costs of construction as determined by defendant's chief engineer.

The agreement provided that defendant was to prepare plans and specifications for the construction of the South Slope Trunk and present same to plaintiff for approval. Upon receipt of such approval, defendant's chief engineer was to proceed, as agent for plaintiff, with the calling for bids and the entering into of contracts for the construction and completion of the sewer. Defendant was to furnish, at no cost to plaintiff, engineering, inspection and supervision required to complete the construction, and to furnish all necessary advertising and proceedings incidental to the receipt of bids and the award of contracts. Defendant was to have the exclusive right to determine to whom contracts were to be awarded by plaintiff, and of selection of all materials and equipment to be used in the construction.

Defendant additionally agreed to prepare plans and specifications, award contracts, and inspect, supervise and approve construction of the Trunk, in sufficient time to assure completion of the line in a usable condition within one year from July 1, 1955.

Defendant agreed to obtain all necessary rights of way, including occupational rights of way, and plaintiff agreed to pay the cost of acquisition thereof if demanded by de-

fendant, the cost, if paid by plaintiff, to be deemed a part of the direct cost of construction.

It was further agreed that no payment for the cost of any part of the Trunk should.be made by plaintiff without approval of defendant's chief engineer. Plaintiff agreed that it would not approve or accept a job from a contractor engaged in doing the work of construction until plaintiff had first received written certification from defendant's chief engineer that the job had been completed in accordance with the plans and specifications prepared by defendant, and certifying that the job was ready for acceptance by plaintiff. Upon completion of the Trunk in accordance with the plans and specifications, defendant's chief engineer was to certify that fact in writing to plaintiff and to defendant, together with his certification of the total, actual, and direct cost of construction approved by him.

It was further agreed that upon receipt of such certification plaintiff would sell and defendant would purchase said Trunk and appurtenant works by documents of title approved by defendant's counsel for a sum equal to the total costs thereof as certified.

The final paragraph of the agreement provides that defendant, in preparing plans and specifications, advertising for bids, awarding contracts, requiring bonds, and inspecting and supervising the work, would in all possible respects follow the customary procedure employed and used by it with respect to its own contracts.

The events transpiring following the execution of the July 1, 1955, agreement are revealed by a stipulation of facts and by other evidence. The stipulation of facts recites as true the following facts among others: (1) That subsequent to July 1, 1955, plaintiff and defendant each proceeded to perform, and did perform, the terms and conditions provided in the July 1, 1955, agreement to be performed on their respective parts during the period of construction of the South Slope Trunk; (2) That plaintiff has fully paid all of its contractors for labor, services and material furnished in the construction of the Trunk; (3) That on August 7, 1956, construction of Section 2 of the Trunk was completed by plaintiff's contractor, and no further services were performed by said contractor after August 7, 1956; (4) That on August 10, 1956, defendant's resident engineer made a complete inspection of the work performed by the contractor on Section

2 of the Trunk, and found it to be completed and without defects; (5) That on September 11, 1956, the defendant's resident engineer reported to defendant's division engineer that the construction of Section 2 had been completed by the contractor and had been found to be without defect; (6) That on September 12, 1956, defendant's board of directors approved the acceptance and final payment by plaintiff to its contractor for the construction of said Section 2, and authorized its chief engineer and general manager to so certify to plaintiff; (7) That on September 21, 1956, defendant advised plaintiff by letter that Section 2 of the Trunk was ready for acceptance by plaintiff; (8) That on October 26, 1956, plaintiff's counsel wrote to defendant's counsel, enclosing a proposed form of transfer instrument; (9) That on October 31, 1956, defendant's counsel wrote to plaintiff's counsel, enclosing revised pages 4 and 5 of the transfer instrument prepared by plaintiff's counsel; (10) That defendant's counsel did not, prior to sending said letter on October 31, 1956, have any knowledge of damage to Section 2 of the Trunk; (11) That on November 6, 1956, defendant's chief engineer orally advised plaintiff's attorneys that a portion of Section 2 had been damaged and another portion had become unusable by virtue of earth movements in a landslide area in the Palos Verdes Hills, and the chief engineer thereupon outlined on a geologicial survey map the location of the landslide area in which a portion of Section 2 had been constructed; (12) At said meeting on November 6, 1956, defendant's counsel advised plaintiff's counsel that he could not and would not approve acceptance of title by the defendant district to the damaged portion or to the unusable portion of Section 2, or authorize purchase of or payment for same; (13) That on or about December 12, 1956, the parties made and entered into an agreement, attached as Exhibit "C" to the complaint, and that thereafter the parties performed their respective obligations undertaken therein, and in particular those specified in paragraphs 1 and 2, providing for the transfer by plaintiff to defendants of all portions of the South Slope Trunk, excepting those in Section 2 located between Station 5 plus 72 and Station 74 plus 67, and providing for the payment by defendant to plaintiff of the portion of the purchase price attributable to the portion of the South Slope Trunk so transferred; (14) That the total actual and direct cost of construction, as certified by defendant's chief engineer, applicable

to the destroyed, damaged and unusable portion of Section 2 located between Station 5 plus 72 and Station 43 plus 95 was $102,875.35, and the total actual and direct cost of constructing the so-called undamaged but unusable portion located between Station 43 plus 95 and Station 74 plus 67 was $90,953.20.

On October 5, 1956, defendant advised plaintiff of the amount remaining to be paid to the contractor on account of the construction of Section 2 and that such final payment was due October 17, 1956. Plaintiff made such final payment on October 17 in the sum of $59,001.25.

The evidence discloses that the South Slope Trunk was designed to be 44,910 feet long. For the purposes of awarding construction contracts, it was divided into six numbered sections and an outfall section. Commencing on October, 1955, construction contracts for the seven sections were awarded. There is no dispute between the parties concerning Sections 1, 3, 4, 5 and 6 and the outfall section. They were constructed in accordance with the July 1, 1955, agreement, they were accepted by defendant, and plaintiff was paid the total actual and direct costs of their construction amounting to $829,817.60.

Neither defendant nor plaintiff had access to most of the land through which Section 2 was to be constructed. Accordingly, on January 9, 1956, defendant instituted a condemnation proceeding to acquire temporary and permanent easements. The complaint alleged that the easements were to be devoted to public use and that the public interest and necessity required the acquisition by defendant of these easements for the installation and use of a sewer line. That same day, January 9, 1956, the court, upon application by defendant, made its order putting defendant into possession of these easements.

Four days later defendant, exercising its exclusive right to determine the contractor, advised plaintiff that defendant had approved the award of the contract for the construction of Section 2 to Vido Artukovich and Son, Inc. The construction contract was awarded on January 18, 1956, and construction on Section 2 began approximately one month later on February 20, 1956. The construction contract was in substantially the same form as contracts customarily awarded by defendant.

Artukovich completed his work on August 7, 1956. The job was inspected by defendant on August 10th and found to be completed in accordance with the plans and specifica-

tions. On September 12, 1956, defendant's board of directors met and approved the acceptance and final payment by plaintiff to Artukovich and authorized defendant's chief engineer and general manager to so certify to plaintiff. Nine days later, on September 21st, plaintiff was notified of this action. The next day, September 22, 1956, defendant's resident engineer made a visual inspection of a portion of Section 2 by actually crawling through more than a half mile of sewer pipe. He observed damage to the pipe caused by a landslide in the geological landslide area through which the Trunk had been installed. He reported this damage to his superiors on September 24th, but not to plaintiff.

Three separate inspections were made of Section 2 by the defendant during October and the progressive nature of the damage was observed. During this period defendant, through its engineers, was studying the damaged area.

On October 5, 1956, during the time that defendant was aware of the progressive damage to Section 2, but while plaintiff was yet unaware of it, defendant wrote to plaintiff instructing that the final payment to Artukovich should be made on October 17th. Such payment was promptly made. Although defendant became aware of the damage to the sewer line on September 22, 1956, no steps whatsoever were taken to advise plaintiff of the damage before November 6, 1956.

Shortly thereafter, defendant designed and constructed on the surface of the ground a bypass line and pumping station crossing the area of the slide and an area which did not slide. This bypass line connected into Section 2 at Station 63 plus 22 using some 1,100 feet of the rejected line. It then proceeded easterly and connected into the existing line a few feet from the beginning of Section 2. It consisted in part of a flexible joint concrete line and in part of a flexible steel line. By April 22, 1958, the South Slope Trunk throughout its entire length was in use and transporting sewage to the White Point outfall.

The findings of the trial court include the facts contained in the foregoing stipulation. The court also found in part that substantially all of Section 2 of the South Slope Trunk, as planned and designed by defendant, required the crossing of land owned by others than defendant. In order to acquire rights of way for sewer purposes and for occupational purposes during the course of the construction of Section 2, defendant commenced a condemnation proceeding against the

owners of such property interests on January 9, 1956. Defendant thereafter acquired by negotiation the sewer easements and occupational rights of way over all the land through which Section 2 was constructed; that at the time the contract for construction was awarded on January 18, 1956, the defendant had obtained possession, by court order, of all of Section 2. That at the time defendant prepared the plans and specifications for the Trunk it was aware that Section 2 would traverse a geological slide area but concluded this area had achieved stability and, therefore Section 2 could be constructed through this slide area with safety. That during the course of construction both parties performed their obligations contained in the agreement of July 1, 1955, as amended. During that time defendant furnished the services of its entire staff and had present at all times at the job-site a resident inspector and, at frequent intervals, a resident engineer. During the construction of the Trunk, including Section 2, plaintiff did not have any of its personnel at the job-site or any one in any way observing the performance of the construction activities.

The court further found that the South Slope Trunk was embedded in the soil and affixed to the ground, and could not be removed therefrom without destroying or seriously damaging it; that the parties intended the Trunk be so permanently embedded and affixed and be and remain a part of the real property and that it was in fact real property.

The court further found that the construction of the Trunk, including the bypass line and the pumping station in connection with it, was planned, designed, located, constructed, supervised and inspected in the same manner as if defendant had undertaken the full responsibilities for construction without any arrangements whatsoever with plaintiff. Judged by the terms of the July 1, 1955, agreement, as amended, and judged by the conduct of the parties in the performance of the obligations contained therein, defendant assumed the risk of all damage to, or destruction of, portions of the Trunk designed and engineered by it. Plaintiff did not at any time assume the risk of any damage to, or destruction or loss of the Trunk. The Trunk was constructed in and upon ground over substantially all of which defendant had obtained sewer easements and rights of way for sewer purposes. It was connected with defendant's White Point Outfall sewer. Upon completion, the Trunk was in the possession of defendant.

Upon completion of Section 2, on August 7, 1956, it was in the possession of defendant. On December 12, 1956, the parties agreed in writing that if by final judgment it should be determined that defendant is obligated to accept plaintiff's transfer of plaintiff's right, title and interest in and to the portion of Section 2 between Station 5 plus 72 and Station 74 plus 67, plaintiff would promptly execute and deliver to defendant a good and sufficient assignment and bill of sale covering said portion and that defendant should thereupon become obligated to pay to plaintiff the sum of $193,828.55, said sum to be paid within forty-five days after final judgment in plaintiff's favor; and that plaintiff should be entitled to interest on said sum of $193,828.55 at the rate of 2½ per cent per annum from December 12, 1956, until the date of entry of judgment herein, and thereafter at the rate of seven per cent per annum. The judgment in favor of plaintiff as first indicated followed.

Defendant assigns as error numerous of these findings by the court including those that the South Slope Trunk was real property in possession of defendant, and that Section 2 of said Trunk was in the possession of defendant on August 7, 1956, the date of its completion. Defendant contends the court erred in failing to find that the Trunk was personal property and that property therein had not passed from plaintiff to defendant at the date of damage thereto.

The agreement of July 1, 1955, as amended, while otherwise comprehensive, makes no specific reference to loss. Under such circumstances defendant argues that the presumed intention of the parties governing the subject of risk of loss must be read into the agreement by the application of section 1742, Civil Code, if personal property is involved and section 1662, Civil Code, if real property.

Defendant asserts, notwithstanding the finding to the contrary, it was the intention of the parties under their agreement that the Trunk sewer was to remain personal property until such time as the transfer of title thereto was effected through documents of title approved and accepted by defendant.

Section 1742, Civil Code, provides in part: "Unless otherwise agreed, the goods remain at the seller's risk until the property therein is transferred to the buyer, but when the property therein is transferred to the buyer the goods are at the buyer's risk whether delivery has been made or not, . . ."

This section is a part of the Uniform Sales Act and specifically deals with "goods." In support of its position that the Trunk sewer is goods and that the risk of loss herein is in plaintiff under said section 1742, defendant cites and relies on *Capitain* v. *L. A. Wrecking Co.*, 37 Cal.2d 527 [233 P.2d 544], and *Nead* v. *Specimen Hill Min. Co.*, 52 Cal.App.2d 475 [126 P.2d 450]. These cases are clearly distinguishable from the instant case however. The first cited case deals with an agreement to purchase a house to be moved, delivery of which was not to be complete until the mover had placed the house on the new foundation. Although moved to the buyer's lot, the house was still on the mover's blocks when it burned. Under such circumstances the house was conceded to be personal property. The Nead case deals with mining machinery and equipment sold to a lessee of a mine upon a conditional sales contract. Title was specifically reserved in the seller and the purchase price was never paid. Although the machinery and equipment was installed in and affixed to the mine a subsequent purchaser of the mine acquired title with full knowledge that such items were sold with title reserved by agreement in the seller. They were therefore held to be personal property with the purchaser of the mine bound by the agreement.

On the contrary, the evidence herein fully supports the finding that the South Slope Trunk was embedded in the soil, was affixed to the ground and could not be removed therefrom without destroying or seriously damaging it. The parties intended it to be so permanently embedded and affixed and to be and remain a part of the real property and it was in fact real property. This sewer line consists of almost nine miles of embedded underground concrete sewer pipe of a size through which a man can crawl. It is permanently joined at each pipe length and the system contains treatment and pumping plants. The Trunk was therefore a fixture and has, by the manner in which it is affixed, become an integral part of the premises. (Civ. Code, §§ 1013, 1019.)

*Robinson* v. *City of Glendale*, 182 Cal. 211, 213 [187 P. 741] is closely analogous. There it was held that where pipe lines are embedded in the soil for the purpose of supplying water they, and the easements granted by the owners of the lands in which the pipes are embedded, are real and not personal property. Their character as real property is not affected by the fact that the pipes were not in use carrying water

when the action was begun. To the same effect see *Southern Pac. Co.* v. *Spring Valley W. Co.*, 173 Cal. 291, 296 [159 P. 865, L.R.A. 1917E 680]; *Trask* v. *Moore*, 24 Cal.2d 365, 368 [149 P.2d 854].

■ One of the tests to be applied in determining whether an article used in connection with realty is to be considered a fixture is the intent of the parties. ■ That the parties herein intended the Trunk to be a fixture and therefore a part of the realty is shown by the manner of its affixation whereby it has become so absorbed or merged into the realty that its identity as personal property is lost. Particularly where, as here, it cannot be removed without practically destroying it. (*Western etc. Tel. Co.* v. *Modesto Irr. Co.*, 149 Cal. 662, 665 [87 P. 190, 9 Ann.Cas. 1190]; *Hendy* v. *Dinkerhoff*, 57 Cal. 3, 6 [40 Am.Rep. 107]; 22 Cal.Jur.2d 266, § 8.)

■ The Trunk being real property and the agreement of the parties of July 1, 1955, as amended, containing no language prescribing their rights and liabilities in case of injury to or destruction of any part of the subject matter, we must look to section 1662, Civil Code, for guidance. This section is the Uniform Vendor and Purchaser Risk Act and its pertinent parts are as follows:

"Any contract hereafter made in this State for the purchase and sale of real property shall be interpreted as including an agreement that the parties shall have the following rights and duties, unless the contract expressly provides otherwise: . . .

"(b) If, when either the legal title or the possession of the subject matter of the contract has been transferred, all or any part thereof is destroyed without fault of the vendor . . ., the purchaser is not thereby relieved from a duty to pay the price, nor is he entitled to recover any portion thereof that he has paid."

If we consider, for present purposes, the plaintiff to be the vendor as described in the section, it is undisputed that the injury to or destruction of part of the Trunk was without its fault. Therefore if either legal title or possession of the Trunk has been transferred before the destruction the defendant, as purchaser, is not relieved from a duty to pay for it.

The evidence shows that under the agreement of the parties as drawn by defendant, the latter reserved to itself the entire planning, inspection and supervision of construction, the calling for bids, the letting of contracts, the selection of materials

and equipment, all in sufficient time to assure completion of the Trunk in a usable condition within one year from July 1, 1955. Defendant further agreed and did proceed to obtain, by court order, possession of all necessary occupational rights of way. Defendant agreed to perform all acts under the agreement on its part to be performed in all possible respects in accordance with the customary procedure employed and used by it with respect to its own contracts.

Plaintiff's obligations under the agreement were limited generally to approval of plans and contracts as submitted by defendant, and to paying the contractor for the completed job upon certification by defendant.

At the time Section 2 was damaged defendant had acquired sewer easements and rights of way in a substantial portion of the land through which it ran and all the damaged portions thereof were either situated in portions of land covered by such easements and rights of way or were physically attached to other portions of the lines so situated.

These facts demonstrate that, from the beginning of work on the Trunk to November 6, 1956, the date when defendant advised plaintiff it would not approve acceptance of documents of title, defendant exercised primary dominion and control over the entire project. These were acts and evidence of possession.

That the parties themselves recognized possession to be in defendant is further demonstrated by their written agreement of December 12, 1956, wherein it is stated: "It is recognized that the unusable portion of said South Slope Trunk is situated within easements heretofore acquired and now owned by District, and that accordingly District will have the power at any time in the future to make use thereof if in its judgment earth conditions have been so stabilized as to make that course appear feasible. . . ."

Before Section 2 had sustained any injury defendant had officially approved it, had certified it to be complete without defects, had authorized payment of the contractor by plaintiff and had received from plaintiff a proposed form of transfer of title. Whatever title then remained in plaintiff was in effect then tendered to defendant upon payment by the latter of the money due plaintiff under the agreement. To complete the purchase nothing remains to be done excepting the execution and delivery by plaintiff of the necessary document of title and its acceptance and payment therefor by defendant.

When such is the case a court of equity, in accordance with its familiar rules considering that as done which ought to be done in favor of him to whom, and against him from whom, performance is due (Civ. Code, § 3529; *Flickinger* v. *Shaw*, 87 Cal. 126, 133 [25 P. 268, 22 Am.St.Rep. 234, 11 L.R.A. 134]; *Beverly* v. *Blackwood*, 102 Cal. 83, 91 [36 P. 378]; *Elliott* v. *McCombs*, 17 Cal.2d 23, 31 [109 P.2d 329]; *Godfrey* v. *Witten*, 138 Cal.App.2d 610, 615 [292 P.2d 247]) may, as was done here, specifically direct the parties to perform such acts and execute such documents as may be necessary to fully effectuate a transference of title to the property.

By its judgment the court properly ordered defendant, by the terms of its agreement of July 1, 1955, as amended, to accept the transfer from plaintiff of plaintiff's right, title and interest in and to the involved portions of Section 2 of the South Slope Trunk and to pay plaintiff therefor the stipulated sum, with interest.

The judgment is affirmed.

Fox, P. J., and Ashburn, J., concurred.