Filed 10/1/15  Chevron U.S.A. v. IRA Administrators CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| CHEVRON U.S.A., INC.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>IRA ADMINISTRATORS, INC.,<br><br>    Defendant and Respondent. | C072097<br><br>(Super. Ct. No. 39201100267430CUORSTK) |

Plaintiff Chevron, U.S.A., Inc. (Chevron) entered into a purchase agreement to buy a parcel of land.  The seller agreed to build improvements on the parcel to Chevron's specifications before Chevron took legal title.  Defendant IRA Administrators, Inc. (IRA), a creditor of the seller, subsequently recorded a lien against the property not long before the improvements on the property were completed.  The seller did not tell Chevron about IRA's lien and Chevron did not discover it until the following year.  When IRA began judicial foreclosure on the lien, Chevron initiated this action to quiet title, arguing

1

that it acquired equitable title by means of equitable conversion when it executed the purchase agreement, and Chevron's interest in the property is superior to any claim by IRA. The trial court disagreed and granted IRA's motion for summary judgment.

Chevron now contends (1) it acquired equitable title through equitable conversion when it signed the purchase agreement; (2) the trial court erred in construing the purchase agreement as executory and conditional until closing; and (3) Chevron's prior equitable conversion defeats IRA's attachment lien.

We conclude Chevron did not have legal or equitable title when IRA's lien was recorded. The trial court correctly construed the purchase agreement as executory and conditional, and equitable conversion principles do not apply in this case to prevent summary judgment.

We will affirm the judgment.

BACKGROUND

TCN Properties, L.P. (TCN) and Chevron entered into an Agreement of Purchase and Sale and Joint Escrow Instructions (purchase agreement) on November 4, 2008. The parties agreed that TCN would transfer to Chevron title to property in Lathrop, California, subject to TCN first constructing an office building and ancillary improvements on the property to Chevron's specifications. Chevron paid an initial deposit of $100,000, an increased deposit of $1.6 million on December 23, 2008, and the balance in monthly progress payments, save for 10 percent to be paid at the close of escrow. The obligations of each party were dependent on the other having complied with numerous conditions, including Chevron's final acceptance of the construction.

TCN gave Chevron a promissory note and deed of trust characterizing Chevron's deposit and progress payments under the purchase agreement as secured loans. The deed of trust was recorded on December 23, 2008. Between November 2008 and August 2009, Chevron paid TCN more than $8 million for the construction of a 24,100 square

2

foot building with related improvements, reserving about $700,000 for payment at closing.

On August 11, 2009, IRA obtained a court order to encumber TCN's real property based on an unpaid 2006 promissory note. That same day, Chevron assigned all of its rights and obligations under the purchase agreement to Lyontree Equity Exchange, Inc., (Lyontree), including title to the $8.7 million purchase price and the right to receive title to the land at the close of escrow.

On August 20, 2009, IRA obtained a $2.5 million attachment lien on the subject property. On August 24, IRA perfected its lien by recording it and posting a notice on the subject property.

On August 27, 2009, TCN and Lyontree executed a Joint Closing Agreement and Escrow Instructions. Subject to numerous closing conditions, including Chevron's final acceptance of the construction, release of mechanics' liens and receipt of a permanent certificate of occupancy, the Joint Closing Agreement and Escrow Instructions provided for the release of final payments and the transfer of title. On August 28, 2009, TCN conveyed title to Lyontree, who conveyed it to Chevron on December 31, 2009.

IRA subsequently filed a stipulated judgment against TCN in the amount of $2.6 million. TCN was to make monthly installment payments until March 1, 2011, when the full amount would be due. On July 18, 2011, IRA's writ of execution was entered on the March 2010 judgment, stating that the subject property would be sold to satisfy TCN's debt to IRA, which then totaled $2.9 million. Chevron filed an action to quiet title.

IRA filed a motion for summary judgment, asserting that its rights were superior because it recorded its writ of attachment before Chevron recorded its grant deed. Chevron asserted in opposition that its claim to the property was established in November 2008 when it entered the purchase agreement, so its title was free and clear of IRA's August 2009 attachment lien. The trial court agreed with IRA and granted judgment in its favor.

3

Additional facts are included in our discussion of the issues on appeal.

DISCUSSION

I

Chevron contends it acquired equitable title through equitable conversion when it signed the purchase agreement.

A

Before we discuss Chevron's equitable contentions, we review the applicable law. A judgment lien on real property is created by recording an abstract of money judgment. (Code Civ. Proc., § 697.310.) When real property subject to a recorded lien is transferred, the lien remains intact despite a subsequent transfer or encumbrance of the property unless the lien has been satisfied or extinguished. (Code Civ. Proc., § 697.390.) Recording a conveyance provides constructive notice to subsequent purchasers and mortgagees. (Civ. Code, § 1213.) The term conveyance means every written instrument affecting title to real property except wills. (Civ. Code, § 1215.) "Every conveyance of real property . . . is void as against [any subsequent bona fide purchaser whose conveyance is first duly recorded] and as against any judgment affecting the title, unless the conveyance shall have been duly recorded prior to the record of notice of action." (Civ. Code, § 1214.) "Other things being equal, different liens upon the same property have priority according to the time of their creation. . . ." (Civ. Code, § 2897.)

Where there are competing claims to the same real property, priority is ordinarily determined by the date of recording, not the date of transfer. (*Bratcher v. Buckner* (2001) 90 Cal.App.4th 1177, 1185.) When encumbered real property is conveyed, the transferee is charged with constructive knowledge of recorded encumbrances and takes title subject to them. (*Federal Deposit Ins. Corp. v. Charlton* (1993) 17 Cal.App.4th 1066, 1069.) Moreover, when a creditor forecloses on a properly recorded lien, the creditor is entitled to reach whatever increase in equity has been added to the property, even if the additional equity was added after the debtor transferred title to someone who had only constructive

4

notice of the lien. (*Kinney v. Vallentyne* (1975) 15 Cal.3d 475, 479.) A corollary to this rule is that if title has passed to a third party before a creditor records its lien, the lien does not attach and the creditor takes nothing. (See *Barisich v. Lewis* (1990) 226 Cal.App.3d 12, 19 [title passed through an effective but unrecorded deed before lien was filed], citing *Spear v. Farwell* (1935) 5 Cal.App.2d 111, 114 [lien of judgment creditor cannot attach if debtor has only naked legal title].)

Here, IRA recorded its lien before Chevron acquired legal title to the property. Lyontree had constructive notice of IRA's lien when it obtained title from TCN, because the lien was recorded four days earlier. (Civ. Code, § 1213.) And Chevron had constructive notice of the lien several months later when Lyontree conveyed title to Chevron. Chevron extinguished its December 2008 deed of trust 20 days before IRA recorded its lien. Chevron then recorded an unrestricted reconveyance to TCN four days after IRA's lien, and TCN transferred title to Lyontree the same day. On the day IRA recorded its lien, the property was not encumbered by any recorded interest of Chevron. But when Lyontree and Chevron took title, IRA's lien had been recorded.

The record provides insight into why Chevron arranged to improve the property before obtaining legal title. The purchase agreement included provisions for compliance with Internal Revenue Code section 1031, which pertains to tax-deferred exchanges. A 1031 exchange is an "exchange of investment property to defer capital gains taxes." (*McGuire v. More-Gas Investments, LLC* (2013) 220 Cal.App.4th 512, 516, fn. 2.) However, the transaction is subject to significant restrictions when the exchange is not simultaneous, such as when the taxpayer builds on the acquired property intending to include construction costs in the deferred value. (See *DeCleene v. C.I.R.* (2000) 115 T.C. 457, 469-470 [transaction did not qualify as 1031 exchange because taxpayer retained beneficial ownership of transferred property to oversee construction on it]; Rev. Proc. 2000-37, 2000-40 I.R.B. 308 [establishing detailed "safe harbor" procedure in light of rule that one who bears economic burdens and benefits of ownership will be treated as

5

property's owner for federal tax purposes].) Chevron's counsel explained that Chevron's interest in a tax-deferred exchange drove the details of the transaction.

Nonetheless, Chevron now relies on equitable principles to survive summary judgment. Chevron does not explain why its legal remedies were inadequate, a significant omission given that equitable relief is only available if there is no adequate legal remedy. (*Hicks v. Clayton* (1977) 67 Cal.App.3d 251, 264.) Equitable conversion is employed only when " 'necessary to accomplish manifest justice.' " (*Vigli v. Davis* (1947) 79 Cal.App.2d 237, 255.) "[N]o principle is more firmly settled than that equity will not come to the aid of one who, through his own delay and own fault, has lost the remedy which the law has provided." (*De Mattos v. McGovern* (1938) 25 Cal.App.2d 429, 433.)

Chevron simply indicates that it can prevail against IRA only by applying equitable doctrines. To understand Chevron's equitable arguments, we turn to a discussion of the relevant principles in equity.

B

"When a binding, executory contract for the sale of real property is entered into, an equitable conversion of the property occurs on the theory that a court of equity will regard as done that which ought to have been done, and under which the purchaser is deemed to be the equitable owner of the property and the seller the owner of the purchase money. Thus, an unconditional land sale contract that is susceptible of a decree for specific performance conveys to the purchaser the equitable title to the property, and in equity the purchaser is considered its owner." (30 Cal.Jur.3d Equitable Conversion, § 10; *Mamula v. McCulloch* (1969) 275 Cal.App.2d 184, 193 [equitable conversion is a fiction resting on the maxim that equity regards as done that which ought to have been done].) When a purchaser has performed all conditions precedent under a contract for the purchase and sale of land, "he will be deemed on that day to be the owner of the land and

6

the seller to be the owner of the purchase money." (*In re Estate of Dwyer* (1911) 159 Cal. 664, 675 (*Dwyer*).)

In the *Dwyer* case, a buyer proffered the agreed-upon purchase price several days before the agreed-upon deadline, but the seller refused to accept the money or transfer the title. (*Id*. at p. 676.) The seller died before the court ordered specific performance. (*Id*. at p. 667.) In a subsequent will contest, the court determined that equitable title passed from the seller to the buyer on the day the contract required it to be passed, so the seller's estate was deemed to have held equitable title to the purchase money funds when the seller died, meaning equitable title to the land had passed to the buyer. (*Id*. at p. 676.) The date of the equitable conversion was not the date the parties signed the contract or even the date the buyer tendered the purchase price, but rather the date identified in the contract as the deadline for the seller to convey title. (*Id*. at p. 667, 676.) In other words, the buyer acquired equitable title at the moment all conditions precedent were fulfilled and nothing remained except a court order for specific performance of the seller's obligation to convey title. (Accord *Andover Land Co. v. Hoffman* (1968) 264 Cal.App.2d 87, 90 ["When all conditions of the (parties') instructions have been complied with an equitable title to the money vests in the seller and an equitable title to the property vests in the buyer."].)

The trial court in this case cited *Lang v. Klinger* (1973) 34 Cal.App.3d 987, which rejected an argument for equitable conversion because a judgment debtor's pending sale to the appellant was conditioned on that party obtaining financing. The *Lang* case relied on a 1941 treatise that Chevron contends does not apply in California. (4 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 1159, p. 472.) Words sufficient to effect an equitable conversion must be absolute and there can be no equitable conversion if the parties retain for themselves any option, discretion or choice. (*Id*. at § 1160, p. 476) A shorthand formulation of this rule is that the contract must be valid, binding and "specifically enforce[able] against an unwilling purchaser." (*Id*. at § 1161, p. 479.)

7

Chevron claims Pomeroy's narrow construction has been eschewed in California, replaced by a broader rule that would apply to its arrangement with TCN and Lyontree, but that contention is not supported by the cited authority. (See *Kinnison v. Guaranty Liquidating Corporation* (1941) 18 Cal.2d 256 [creditor had actual and constructive knowledge of recorded assignment of all rents to another creditor]; *Wheeler v. Trefftzs* (1964) 228 Cal.App.2d 271 [when title was acquired by fraud, equity permitted true owner to defeat a judgment lien for fraudster's debt].)

There is no dispute that the purchase agreement in this case was valid and binding. As for it being specifically enforceable, Chevron points to paragraph 5 of the purchase agreement, titled Liquidated Damages. Paragraph 5 says that "IF SELLER DEFAULTS UNDER THIS AGREEMENT PRIOR TO THE CLOSING AND FAILS TO COMPLETE THE SALE AS PROVIDED HEREIN," Chevron shall have the option to either (A) terminate the purchase agreement and claim liquidated damages, or (B) pursue specific performance. Chevron argues it "could have obtained a decree of specific performance." Not so. Although there is evidence that seller TCN committed a minor breach by failing to notify Chevron of the lien, there is no evidence or contention in the record that TCN materially defaulted prior to closing and failed to complete the sale, or that Chevron ever sought specific performance. Paragraph 5 of the purchase agreement does not entitle Chevron to specific performance on this record.

To the extent Chevron suggests that the mere mention of the words "specific performance" in paragraph 5 brings this case within the ambit of the cases where equitable conversion has been approved, we disagree. The Chevron/TCN purchase agreement included a series of interdependent conditions and obligations that were in place until the building construction project was complete. Until all were fulfilled, the purchase agreement was not specifically enforceable in the sense of being "complete and certain in all particulars essential to its enforcement." (See *Magna Development Co. v. Reed* (1964) 228 Cal.App.2d 230, 235 [completeness and certainty required for specific

8

enforcement of real estate contract]; see also Civ. Code, § 3390 [obligation not specifically enforceable if not sufficiently certain to make precise act to be done clearly ascertainable].)  Chevron acknowledged the purchase agreement's incomplete and conditional status in its August 11 assignment to Lyontree:  Chevron transferred title to the purchase price (the amount due on closing and the amounts already advanced to TCN) and did not purport to transfer title to the land.  Even after IRA's lien was recorded, the close of escrow was still conditional.

When Chevron entered into the purchase agreement, it reserved the right to withdraw from the transaction and to recover all but a small portion of its substantial investment in the construction until eight specific closing conditions were met, including governmental approval of any necessary access roads, Chevron's formal approval of the construction project, and the absence of any encumbrances Chevron had not approved in writing.  Specific performance was not available on the day IRA filed its lien because there were still outstanding contingencies.  The mere mention of specific performance in the purchase agreement did not make the purchase agreement susceptible to equitable conversion on the date of signing.

The purchase agreement required TCN to execute a promissory note and a deed of trust against the possibility that TCN would not use Chevron's periodic payments to build facilities that met Chevron's specifications and Chevron's schedule.[1]  Recording the deed of trust gave Chevron a lien on the property, but it did not give Chevron legal or equitable title.  (See *Bank of Italy Nat. Trust & Sav. Assn. v. Bentley* (1933) 217 Cal. 644, 655 [in this state, a deed of trust is a mortgage with a power of sale; it does not convey title].)

---

[1]  Chevron argued that this offered no real security because if it had foreclosed on its recorded deed of trust to recover its investment, its stated plan for a tax-free exchange would have been thwarted.  We decline to speculate on the extent to which Chevron might have let tax consequences control its exercise of contract rights.

9

The fact that Chevron held a promissory note and deed of trust was consistent with a mutual intent for legal and equitable title to remain with TCN, subject to Chevron's right to recoup its investment in the event of TCN's breach. Further substantiating the notion that Chevron took no equitable interest in the title before closing, the purchase agreement required that TCN indemnify Chevron for any third party claims relating to the property, maintain substantial insurance against such claims, and not withhold permission for Chevron to enter the property with notice. Moreover, the purchase agreement explicitly gave TCN the right to allow liens to encumber the property, although it required TCN to inform Chevron about them and to release them before closing. TCN failed to meet its contractual obligations by not telling Chevron about the IRA lien, but nothing in the purchase agreement prevented TCN from clearing the lien at or before the time of closing and nothing prevented Chevron from refusing to close until the lien was cleared.

On August 27, three days after IRA's interest in the property was perfected by the recording of its lien and one day before Chevron took possession, TCN and Chevron's assignee, Lyontree, issued Joint Closing and Escrow Instructions identifying several remaining unfulfilled purchase agreement conditions, including not just delivery of the final payment, but also final acceptance of the improvements and the buyer's satisfaction that there were no outstanding liens. A judgment lien recorded against real property is ineffective if a buyer has paid the purchase price and no equitable interest remains in the judgment debtor, even if closing formalities remain. (*Casey v. Gray* (1993) 13 Cal.App.4th 611, 614 [fully executed quitclaim deed effective although unrecorded].) But although most of the purchase price had been paid in this case, the outstanding conditions were more than ordinary closing formalities.

As we have said, the doctrine of equitable conversion is triggered when a real estate transaction is completed to such an extent that the seller can be said to be merely holding legal title in trust for the buyer. (*Andover Land Co. v. Hoffman, supra,*

10

264 Cal.App.2d at p. 90.)  An installment sales contract or mortgage is a classic example; the buyer lives in and controls the property but legal title is retained by the seller as security for the balance of the purchase money.  (See *Petersen v. Hartell* (1985) 40 Cal.3d 102 [discussing installment sales contracts].)  Chevron correctly points out that possession is not always the hallmark of equitable title.  Chevron also contends that unfulfilled conditions do not necessarily preclude equitable conversion, but that is only partially correct.  The cases Chevron cites are classic installment sales contracts. (*Alhambra Redevelopment Agency v. Transamerica Financial Services* (1989) 212 Cal.App.3d 1370; *In re Estate of Reid* (1938) 26 Cal.App.2d 362; *In re Estate of Dwyer, supra*, 159 Cal. at p. 675.)  In this case, however, it was not at all certain that title actually would pass to Chevron until the building project was satisfactorily completed. There was no equitable conversion before the conditions were satisfied.  (Compare *Parr-Richmond Industrial Corp. v. Boyd* (1954) 43 Cal.2d 157, 168 [no equitable conversion until seller cleared contractual condition of obtaining merchantable title] with *Palos Verdes Properties v. County Sanitation District No. 5* (1960) 177 Cal.App.2d 679, 690-691 [when defendant already had officially approved and certified completion of construction project on land it was acquiring from plaintiff before a landslide destroyed part of it, title passed to defendant by equitable conversion at the time of its formal approval].)

Chevron cites *Wells Fargo Bank v. PAL Investments, Inc.* (1979) 96 Cal.App.3d 431, which expressed the general rule that "recordation is not essential to the validity of a mortgage, but only affects its priority against subsequent bona fide purchasers."  (*Id*. at p. 438.)  But that statement was made in a context far different than this one, and the court relied on a treatise on secured transactions and two cases involving the priority of fully-executed preexisting but unrecorded security interests.  (*Wells Fargo Bank*, *supra*, 96 Cal.App.3d at p. 438.)  Here, the purchase agreement was not an unrecorded security interest or a mortgage and it anticipated a lengthy and involved process preceding the

11

conveyance of title. It is of no consequence that IRA was not a subsequent bona fide purchaser.

Chevron also cites *RC Royal Development and Realty Corp. v. Standard Pacific Corp.* (2009) 177 Cal.App.4th 1410.) In that case, the court interpreted a real estate brokerage contract and held that a brokerage fee was due even though the broker's client cancelled a sale before closing. (*Id*. at p. 1419.) The court held that the broker's efforts enabled the client to, in the words of the parties' contract, obtain a " 'direct or indirect beneficial interest' " in the property. (*Ibid*.) A brief discussion of equitable conversion in the case quoted *Osborn v. Osborn* (1954) 42 Cal.2d 358, which held that "legal title passes to the grantee at the time of his completion of the conditions precedent, whether or not the escrow holder gives him physical possession of the deed." (*RC Royal Development, supra,* 177 Cal.App.4th at p. 1419, quoting *Osborn, supra,* 42 Cal.2d at p. 363.) *RC Royal* and *Osborn* confirm that there is no equitable conversion if conditions precedent remain unfulfilled.

Another case cited by Chevron is *Orange Cove Water Co. v. Sampson* (1926) 78 Cal.App. 334. In that case, an unrecorded land sales contract equitably conveyed certain property rights from the seller to a group of purchasers, leaving the seller with only " 'dry legal title.' " (*Id*. at p. 341.) But the context was a dispute among purchasers who jointly possessed the property and subdivided it before the deed was recorded. (*Id*. at p. 344.) Chevron also cites *Gilbert v. Sleeper* (1886) 71 Cal. 290, in which terms of an unrecorded land-swap were specifically enforced (*id*. at p. 294), and *In re Estate of Reid*, *supra*, 26 Cal.App.2d 362, which at page 366 discussed equitable title in the context of an installment land sales contract. Chevron claims those cases establish that "a prior, unrecorded equitable title is superior to a subsequently recorded attachment lien." While there are indeed circumstances where the equities of a particular situation favor a prior unrecorded equitable interest over a later-recorded legal interest, the general rule, as we have explained, is based on the time of recordation.

12

For the proposition that equitable conversion takes place on signing, Chevron cites *Los Angeles Dodgers, Inc. v. County of Los Angeles* (1967) 256 Cal.App.2d 918. In that case the Dodgers organization owed property taxes because it acquired equitable title as soon as it agreed to build and maintain a stadium on a government-owned parcel. (*Id*. at p. 924.) However, Chevron reads the case too broadly. The decision did not purport to establish a rule regarding filing priorities.

Other cases cited by Chevron are similarly distinguishable. There is no rule that equitable title always passes upon the signing of a real estate contract, or that equitable title always passes when a contract includes a specific performance clause.

We accept Chevron's concession that the doctrine of equitable conversion does not alter the recording system's priorities and reject its contention that equitable title necessarily passed when it signed a "binding, executory, [and] specifically enforceable contract for the purchase and sale of real property."

We conclude Chevron did not acquire equitable title through equitable conversion when it signed the purchase agreement, and it did not have legal or equitable title at the time IRA recorded its lien.

## II

Chevron next claims the trial court erred in construing the purchase agreement as executory and conditional until closing. We have already rejected this argument, explaining in part I that conditions and contingencies remained in connection with the sale up until the time of closing.

But there is another characterization of the purchase agreement that merits comment. The trial court characterized the purchase agreement as a marketing contract, distinguishing it from an installment land sales contract. Chevron contends the trial court applied equitable conversion too narrowly, assuming that it only applied to installment land sales contracts when, in fact, it applies more broadly to other "binding, executory, [and] specifically enforceable" contracts like the one it had with TCN. Chevron sought

13

to distinguish the purchase agreement from a marketing contract by calling it a security contract. As the trial court aptly observed, though, security contracts and installment sales contracts are synonyms. (See 12 Miller & Starr, Cal. Real Estate (3d ed. 2008) § 34.42.) In contrast to a marketing contract, which exists to transfer title to real property at or near the time of payment of the purchase price, a security or installment sales contract is an instrument similar to a mortgage: it specifies the terms of installment payments and the seller's retention of title as security for those payments. (*Ibid.*)

A buyer under an installment sales contract is said to have equitable title by virtue of the doctrine of equitable conversion. (*Hastings v. Matlock* (1985) 171 Cal.App.3d 826, 837.) A buyer under such an arrangement has rights substantially identical to those associated with a purchase money mortgage. (*Venable v. Harmon* (1965) 233 Cal.App.2d 297, 300-301.) The trial court concluded that the purchase agreement in this case was not an installment sales contract (or a security contract) because the seller retained possession and provided no financing, and because the unconditional exchange of title and purchase price occurred at the close of escrow. Accordingly, the trial court found that no title had yet transferred to Chevron when IRA's lien was recorded.

We agree with the trial court's analysis and conclude that the trial court did not err in its characterization of the purchase agreement.

### III

Chevron ultimately asserts that its prior equitable conversion defeats IRA's attachment lien. We have already concluded that Chevron did not obtain prior equitable title and there was no equitable conversion. Accordingly, the contention lacks merit.

The record indicates that Chevron's desire for a tax-deferred exchange influenced the drafting of the purchase agreement and motivated Chevron to avoid owning or controlling the property prior to improving it. A consequence of that approach, however, was that Chevron was vulnerable to the recording of competing interests before it took title, a fact it recognized by obtaining a promissory note and trust deed from TCN and by

14

further protecting itself with enforceable covenants from TCN about disclosing and resolving liens before closing.

Even if the only remaining condition of sale had been the clearance of liens, the doctrine of equitable conversion did not give Chevron superior title to IRA.  Judgment creditors may not be deprived of their statutory rights based on an equitable doctrine "designed to effect justice in certain rare cases."  (*Lang v. Klinger*, *supra*, 34 Cal.App.3d at p. 992.)

Equitable conversion did not prevent IRA's judgment lien from attaching.

DISPOSITION

The judgment is affirmed.


　　　　　　　　　　　　　　　　　　 /S/
　　　　　　　　　　　　　　　　　Mauro, J.


We concur:


　　　 /S/
Hull, Acting P. J.


　　　 /S/
Duarte, J.

15