[No. B206894. Second Dist., Div. Three. Sept. 29, 2009.]

RC ROYAL DEVELOPMENT AND REALTY CORPORATION, Plaintiff and Appellant, v.
STANDARD PACIFIC CORPORATION, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 2. and 4. of the Discussion.

**COUNSEL**

Esner, Chang & Ellis, Stuart B. Esner and Holly N. Boyer for Plaintiff and Appellant.

Green & Hall, Robert L. Green and John T. Griffin for Defendant and Respondent.

OPINION

ALDRICH, J.—

## INTRODUCTION

A broker contracted with a buyer to locate real property for the buyer to purchase. The buyer entered into a buy-sell contract with the seller, but escrow never closed. The broker sued the buyer to recover its commission. The trial court granted the buyer's motion for summary adjudication of the first cause of action for breach of the broker's agency agreement and the second for breach of the covenant of good faith and fair dealing implied in that agreement, and dismissed the case. The broker appeals. In the published portion of this opinion, we construe the agency agreement and hold that the broker earned its commission at the time the buyer entered into the buy-sell contract and the close of escrow was not a condition precedent to the right to a commission. Thus, the trial court erred in granting summary adjudication of the breach of contract cause of action. In the unpublished portion of this opinion, we hold that triable issues of fact about whether the buyer had cause or acted in bad faith in failing to close escrow precluded summary adjudication of the second cause of action. Accordingly, the judgment is reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The agency agreement between RC and Standard Pacific*

RC Royal Development and Realty Corporation (RC), a licensed California real estate broker, notified Standard Pacific Corporation (Standard Pacific) that it had information about a condominium development project in Los Angeles County. On June 15, 2005, Standard Pacific entered into a written "Confidentiality and Agency Agreement" with RC designating the latter as its agent with respect to information or offers concerning that or other property (the Agency Agreement). Under the Agency Agreement, Standard Pacific agreed to pay RC a brokerage commission equaling 1.5 percent of the gross sales price for the property.

It appears that RC brought Standard Pacific two parcels of real property owned by LPC Union Apartments, L.P. (Lincoln), and located on Alameda Street in downtown Los Angeles, known as Union Station Village (the property).

### 2. *Standard Pacific's transaction with Lincoln*

On August 19, 2005, Standard Pacific entered into a "Real Estate Agreement" with Lincoln to purchase the property for $116 million (the buy-sell

agreement). Thereunder, Lincoln agreed to improve the property by developing two separate buildings containing 107 and 171 condominium units, with subterranean parking and related facilities.

Also on August 19, 2005, Standard Pacific and Lincoln opened escrow on the property. Concurrently with the opening of escrow, Standard Pacific paid a $1 million deposit, and then $5 million as earnest money before September 14, 2005.

The buy-sell contract contained certain conditions. In particular, Standard Pacific agreed that its obligation to close was subject to the satisfaction or waiver of, inter alia, a "review period" that expired on September 14, 2005. Lincoln agreed to provide title and construction documents, among other things, for Standard Pacific's inspection and evaluation. Standard Pacific could terminate the buy-sell contract during the review period without forfeiting its earnest money, but its failure to terminate the buy-sell contract by September 14, 2005, would constitute a conclusive waiver of the conditions contained in the review period.

The buy-sell contract also conditioned Standard Pacific's obligation to purchase the property on the issuance of a temporary certificate of occupancy for phases 1 and 2, the recordation of a final map, and the delivery of the architect's certificate. The buy-sell contract contemplated that the transaction would close within five business days of the issuance of a temporary certificate of occupancy "but in no event *earlier* than January 4, 2006." (Italics added.) Time was not made of the essence of the buy-sell contract.

The temporary certificate of occupancy was never issued. W.A. Colton III, vice-president of development for the Los Angeles division of Standard Pacific, declared in connection with Standard Pacific's summary adjudication motion, that as of August 2006, occupancy permits had not been obtained and there was no certainty about when the project would be completed or when escrow would close. The vice-president of land acquisition of the Los Angeles division of Standard Pacific, Adam Call, declared that the project encountered delays in permitting, inspection, and construction. Meanwhile, the declarants averred, during the period of delay, the condominium market in downtown Los Angeles suffered a reversal with the result that Standard Pacific felt its purchase of the property as a condominium project was no longer economically feasible or beneficial. Escrow never closed and Standard Pacific never acquired the property.

In August 2006, Standard Pacific and Lincoln entered into a release and settlement agreement terminating the buy-sell contract and escrow. Thereunder, Standard Pacific forfeited $4 million, representing its earnest money minus $2 million it spent in investigation and transaction costs on the project. Standard Pacific did not pay RC its commission.

### 3. *The instant lawsuit*

RC brought this action against Standard Pacific seeking damages under theories of, inter alia, breach of contract and breach of the implied covenant of good faith and fair dealing. The gravamen of RC's complaint was that its right to the commission under the Agency Agreement had vested and that Standard Pacific was not justified in declining to finalize its purchase of the property. In the first and second causes of action, respectively, RC alleged that Standard Pacific breached the Agency Agreement by "failing and refusing" to pay RC its commission, and breached the implied covenant of good faith and fair dealing "by failing and refusing to complete" the buy-sell contract without justification or cause.

### 4. *Summary adjudication*

Standard Pacific moved for summary adjudication asserting that RC had no basis for recovery of a brokerage commission because Standard Pacific never breached any obligation it owed to RC. Alternatively, Standard Pacific sought summary adjudication of the breach of contract cause of action on the grounds, inter alia, that the Agency Agreement provided that a commission would be earned only when Standard Pacific's purchase of property "actually closes." Standard Pacific sought summary adjudication of the cause of action alleging breach of the implied covenant on the grounds at all times Standard Pacific acted with justification and in a commercially reasonable manner.

RC opposed the motion relying in part on the words of the contracts at issue and the declaration of Reg DelPonte, senior vice-president at Lincoln.[1]

The trial court granted Standard Pacific's summary adjudication motion. In relevant part, the court interpreted the Agency Agreement to provide that Standard Pacific would have obtained an interest in the property sufficient to trigger its obligation to pay RC's commission only when "all contingencies and conditions have been removed," which events the court found had not occurred. The court ruled that the close of escrow was a condition precedent

---

[1] Although it appears that the trial court sustained an objection to DelPonte's deposition testimony, in fact, no objection was made to the deposition transcript. We also agree with RC that the deposition transcript was adequately authenticated by its trial attorney, William H. Ford III.

to Standard Pacific's obligation to pay RC its commission. Because escrow never closed, no commission was due. The court found that Lincoln's inability to timely deliver a finished project caused the project to drag on. During that time, the Los Angeles market deteriorated, making the project uneconomic and justifying Standard Pacific's decision to terminate the buy-sell contract as a matter of law. As a result, Standard Pacific did not breach the implied covenant of good faith and fair dealing. After the court entered judgment in favor of Standard Pacific, RC's timely appeal followed.

## DISCUSSION

### 1. *Summary adjudication standard of review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Summary adjudication is granted when a moving party establishes the absence of a triable issue of material fact and the right to entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

A defendant moving for summary adjudication carries its burden when it shows that one or more elements of the cause of action cannot be established, or that there is a complete defense thereto. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 853.) Once the defendant has made this showing, the burden shifts to the plaintiff to show a triable issue of one or more material facts exists as to that cause of action or as to a defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).)

On appeal from a summary adjudication, we make "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]" (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222–223 [38 Cal.Rptr.2d 35].) We " 'review the trial court's decision de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' [Citation.]" (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1035 [6 Cal.Rptr.3d 441, 79 P.3d 556].) In so doing, we view the facts and inferences reasonably drawn from those facts most favorably to the appellant. (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1520 [80 Cal.Rptr.2d 94].)

2. *RC's challenges to the trial court's evidentiary rulings are unavailing**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3. *The trial court erred in granting summary adjudication of the first cause of action for breach of contract*

a. *Standard Pacific's obligation to pay RC's commission became fixed at the time it entered into the buy-sell contract with Lincoln, not at the time escrow closed*

The pertinent part of the Agency Agreement is section 2, which reads: Standard Pacific and RC "agree that RC shall be entitled to receive a brokerage commission, to be paid by [Standard Pacific], . . . as compensation for services, *in the event that the Property is purchased by [Standard Pacific]* or an affiliate of [Standard Pacific] within one (1) year of the date of this Agreement. *As used herein 'Purchase' shall mean and include any and all acquisitions of any direct or indirect beneficial interest in the Property, including, without limitation, any lease, option, finance, exchange, stock purchase, joint venture or other transaction through which [Standard Pacific] would acquire a direct or indirect beneficial interest in the Property.* The commission shall be paid to RC by [Standard Pacific] through escrow at closing. [Standard Pacific] and RC further agree that [Standard Pacific] shall include and incorporate a brokerage commission provision in every letter of intent, purchase contract and escrow instructions indicating the amount of the brokerage commission (1.5% of the gross sales price) payable to RC by [Standard Pacific] as compensation for services. [Standard Pacific] hereby specifically authorizes RC to make a demand for payment of its commission/fee earned hereunder to any escrow or other party affecting the transfer of the Property. [Standard Pacific] shall instruct such escrow, and shall cause [Lincoln] to similarly instruct such escrow, to withhold from the gross sales proceeds from the sale of the Property an amount sufficient to pay all commission/fee earned by RC hereunder." (Italics added.)

RC argues that it was entitled to its commission when the property was "purchased" by Standard Pacific as that term is defined in the Agency Agreement as "any and all acquisitions of any direct or indirect beneficial interest in the Property . . . ." RC argues that once Standard Pacific entered into the buy-sell contract, it obtained a "direct or indirect beneficial interest" in the property with the result RC earned its commission. Standard Pacific counters it was not obligated to pay any commission because escrow never closed and so Standard Pacific never acquired any "beneficial interest" in the property.

---

*See footnote, *ante,* page 1410.

■ The interpretation of a written instrument is solely a judicial function unless the interpretation turns upon the credibility of extrinsic evidence. We are not " 'bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' [Citations.]" (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839].) The Agency Agreement is written and its meaning did not turn on extrinsic evidence and so construction of the agreement is a matter of law for independent determination by this court.

■ "A real estate brokerage contract is a contract for employment of an agent, and the relationship is governed by both agency and contract law." (2 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 5:18, p. 69, fn. omitted.) Certain terms are required for a brokerage employment agreement. (2 Miller & Starr, *supra*, § 5:11, p. 41.) However, "the parties are entitled to make the broker's employment and his right to compensation depend upon any lawful condition that they agree to insert in the agreement . . ." (*Steve Schmidt & Co. v. Berry* (1986) 183 Cal.App.3d 1299, 1305 [228 Cal.Rptr. 689]; accord, *R. J. Kuhl Corp. v. Sullivan* (1993) 13 Cal.App.4th 1589, 1599 [17 Cal.Rptr.2d 425] (*R. J. Kuhl*)), such as the close of escrow or upon receipt of funds by the seller from an escrow. (*Steve Schmidt & Co. v. Berry, supra,* at p. 1305; see also 2 Miller & Starr, *supra*, § 5:34, p. 108.)

"While brokerage contracts are typically executed between the *seller* and broker, the same rules apply when the *buyer* employs a broker to find particular property and negotiate a purchase on specified terms [citation]; i.e., the contract may make the buyer's duty to pay a commission contingent on the satisfaction of any lawful conditions—ordinarily, (1) the buyer's entry into a binding contract for purchase, and/or (2) actual consummation of the purchase. [Citation.]" (Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2008) § 2:305, p. 2-76 (rev. # 1, 1999), citing *R. J. Kuhl, supra*, 13 Cal.App.4th at pp. 1600–1601.) Hence, generally, in a buyer-broker agreement—under which the principal employs a broker to find and negotiate a purchase of real estate—"*unless the contract provides otherwise*, the broker earns his commission *upon the principal's entry into a binding contract for a purchase subject to the brokerage contract regardless whether the sale is consummated.* [Citations.]" (*R. J. Kuhl, supra*, 13 Cal.App.4th at p. 1600, italics added.)[2]

---

[2] Standard Pacific's attempt to distinguish *R. J. Kuhl, supra*, 13 Cal.App.4th 1589 is unavailing. Standard Pacific argues *R. J. Kuhl* relied on the covenant of good faith and fair dealing to hold that the principal/buyer was obligated to pay the agent. However, Standard Pacific does not challenge *R. J. Kuhl's* declaration that the obligation to pay the brokerage

Construing the Agency Agreement according to the usual rules of contract interpretation *(Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 979 [41 Cal.Rptr.3d 48]; *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 393 [46 Cal.Rptr.3d 668, 139 P.3d 56]), section 2 of the Agency Agreement defines when RC's right to the commission arises. It provides that "RC *shall be entitled to receive a brokerage commission . . . in the event that the Property is purchased by [Standard Pacific] . . .*" but "purchase" is specifically defined as *"any and all acquisitions of any direct or indirect beneficial interest in the Property,"* and continues with an *incomplete* list of examples. (Italics added.) Fairly read, this provision describing the conditions for the commission, specifies that RC earns its commission when Standard Pacific acquires a "direct or indirect beneficial interest" in the property.

█  A "beneficial interest" is a "[p]rofit, benefit, or advantage resulting from a contract, or the ownership of an estate as distinct from the legal ownership . . . ." (Black's Law Dict. (6th ed. 1990) p. 156, col. 2.) Generally, in the context of real estate transactions, a purchaser "acquires, except against interests prior in right, a conditional, equitable title to the property in fee simple," "[o]n the execution of an agreement for the purchase and sale." (54 Cal.Jur.3d (2008) Real Estate—Contracts for Sale, § 108, pp. 166–167, fns. omitted; see *Osborn v. Osborn* (1954) 42 Cal.2d 358, 363 [267 P.2d 333] ["At the time of the execution of the contract of sale, the grantee acquires an equitable title to the estate being sold; the grantor retains the legal title as security for the purchase price. The legal title passes to the grantee at the time of his completion of the conditions precedent . . . ."]; *Tucker v. Lassen Sav. & Loan Assn.* (1974) 12 Cal.3d 629, 637 [116 Cal.Rptr. 633, 526 P.2d 1169]; *Hunt v. Inner Harbor Land Co.* (1923) 61 Cal.App. 271, 273 [214 P. 998].) In *Alhambra Redevelopment Agency v. Transamerica Financial Services* (1989) 212 Cal.App.3d 1370 [261 Cal.Rptr. 248], the court stated the rule that "a purchaser of real property under a land sales contract is considered an equitable owner of the property and is vested with the right to any condemnation award" where the property was taken after the purchase and sale agreement was executed. *(Id.* at p. 1375.) Therefore, equitable title is a "beneficial interest," as it is one stick in the bundle of full legal rights to real property. Once Standard Pacific entered into the buy-sell contract containing all of the essential terms of purchase, it obtained equitable title. With equitable title, Standard Pacific had a "beneficial interest" in the property and RC earned its commission.

Although a mere executory buy-sell contract was sufficient to confer a "beneficial interest" on Standard Pacific here, our conclusion is bolstered by the undisputed facts showing that Standard Pacific went further than to

---

commission arises upon the principal/buyer's entry into a binding contract for a purchase subject to the brokerage contract.

execute the buy-sell contract. Standard Pacific paid $1 million with the opening of escrow and $5 million as earnest money. It waived its right to terminate the buy-sell contract without forfeiting its earnest money because it did not terminate the agreement during the review period. Standard Pacific even entered into purchase contracts with prospective buyers of units on the property. As Standard Pacific partially performed its obligations under the buy-sell contract, it acquired not only equitable title (54 Cal.Jur.3d, *supra*, Real Estate—Contracts for Sale, § 108, p. 166), but it also obtained a clear advantage resulting from the buy-sell contract (Black's Law Dict., *supra*, p. 156, col. 2) and hence a "beneficial interest."[3] For the foregoing reasons, Standard Pacific cannot persuasively argue it did not have a binding contract that gave it a beneficial interest in the property pursuant to section 2 of the Agency Agreement. (*R. J. Kuhl, supra*, 13 Cal.App.4th at pp. 1600–1601.) As a result, RC earned its brokerage commission on August 19, 2005, when Standard Pacific and Lincoln executed the buy-sell contract.[4]

> b. *The close of escrow was not a condition precedent to Standard Pacific's obligation to pay RC the commission*

Citing Civil Code section 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."), Standard Pacific reads sections 2 and 3 of the Agency Agreement together to argue that its obligation to pay RC's commission was conditioned on the *close of escrow*, and because escrow did not close, the duty to pay the commission never arose.

██ This issue was addressed in *Steve Schmidt & Co. v. Berry, supra*, 183 Cal.App.3d 1299. There, the defendant-seller entered into a listing contract with the plaintiff-broker. (*Id.* at p. 1303.) The seller contended, inter alia, that the obligation to pay the brokerage commission was conditioned on the closing of escrow. (*Id.* at p. 1309.) The relevant portion of the listing agreement stated that the owner would pay a commission to the agent " 'in full at the close of escrow, whether or not said escrow closes within the term of this Agreement.' " (*Ibid.*) The appellate court agreed with the broker that the above quoted language did not set forth the condition for entitlement to a commission but a limitation on the time of payment. (*Id.* at pp. 1309–1310.)

---

[3] The facts of this case distinguish it from *Holland v. McCarthy* (1916) 173 Cal. 597 [160 P. 1069], because in *Holland*, there appeared to be no valid purchase and sale contract between the owner and buyer. (*Id.* at p. 601.)

[4] As the result of our holding here, we need not address RC's alternative contention that the buy-sell contract was an option agreement.

The court explained that "the obligation to pay the commission, as distinguished from the timing of the payment, became fixed at the time a ready, willing and able buyer was produced. Referring to the sequence of provisions in the agreement, immediately after fixing the terms of the agent's obligation (§ 3 of the listing agreement), the term of the authorization (§ 4) and the owner's obligation to accept an offer from a ready, willing and able buyer (§ 5 of the listing agreement), section 6 provides for the time of payment of the commission, that is, 'at the close of escrow.' . . . 'The promise to pay was not contingent on the escrow's closing.' . . . [¶] Thus, we conclude that the failure of the escrow to close does not preclude Schmidt & Co. from collecting its commission." (*Id.* at p. 1310.)

Turning to the portions of the Agency Agreement here discussing escrow, the second half of section 2 states that "The commission shall be paid to RC by [Standard Pacific] *through* escrow at closing." It then requires that Standard Pacific include a brokerage commission provision in the letter of intent, purchase contract and escrow instructions, and instruct escrow to withhold from the gross sales proceeds from the sale of the Property an amount sufficient to pay all commissions/fee earned by RC. Section 3 of the Agency Agreement provides, "If the term of this Agreement ends at a time during which a written contract or negotiations exist between the Owner of the Property and [Standard Pacific] or any affiliate to purchase the Property and such purchase *actually closes*, the term of this Agreement shall be deemed to be extended to include the date of the closing of such purchase and sale." (Italics added.)

The references to escrow in section 2 of the Agency Agreement describe the timing of payment of the commission, not a condition precedent to the earning of that commission. Section 2 of the Agency Agreement is the provision governing the commission. The first half of section 2, as explained, establishes the circumstances under which RC's brokerage commission is earned. The second portion of section 2 then fixes the time and manner in which Standard Pacific pays the commission. It states, "The commission shall be paid to RC by [Standard Pacific] *through* escrow at closing." (Italics added.)[5] Nothing in this language, or the whole of the second portion of section 2, *conditions* the obligation to pay the commission on the close of escrow, Standard Pacific's contention to the contrary notwithstanding. Section 2 contains no words indicating that escrow must close before the commission is earned. For example, section 2 does not provide " 'In the event of

---

[5] The contract's language in *Steve Schmidt & Co. v. Berry, supra,* 183 Cal.App.3d 1299, that the commission would be paid " 'at the close of escrow, whether or not said escrow closes within the term of this Agreement' " (*id.* at p. 1309), is not present in the Agency Agreement. However, also absent from the Agency Agreement is any language requiring escrow to close as a condition to payment of the commission.

consummation of the sale of the property hereinabove referred to, party of second part is to be entitled to a commission . . . .' " (*Cochran v. Ellsworth* (1954) 126 Cal.App.2d 429, 432 [272 P.2d 904].) In fact, two of the Agency Agreement's examples of a "purchase," i.e., a "direct or indirect beneficial interest in the Property," such as would give rise to the obligation to pay a commission, are a lease and a stock purchase. But an escrow is not required in leasing or in stock purchases. The Agency Agreement cannot possibly contemplate that close of escrow be a condition precedent to the obligation to pay the commission where in at least two scenarios escrow would not even exist.

As for section 3 of the Agency Agreement, separate from section 2 which governs the commission, section 3 merely explains the conditions under which the term of the Agency Agreement would be deemed extended; it does not condition the right to a commission on *actual closing*. Had "actual closing" been the intent, then the parties should have used the "actual closing" language in section 2.

■ In sum, the language referring to escrow in section 2 of the Agency Agreement sets the time in which the commission is to be paid and is not a condition precedent to the earning of the commission itself. As in *Steve Schmidt & Co. v. Berry, supra*, 183 Cal.App.3d at page 1310, Standard Pacific's " 'promise to pay was not contingent on the escrow's closing' " but on Standard Pacific's acquisition of a direct or indirect beneficial interest, and the references to escrow only established the timing and manner of payment. "Any other interpretation drawn from the four corners of the [Agency Agreement] would, in our opinion, be facially unsupportable." (*Ibid.*) Because the Agency Agreement does not provide otherwise, RC earned its commission when Standard Pacific entered into the buy-sell contract subject to the Agency Agreement, *irrespective of whether the sale was consummated.* (*R. J. Kuhl, supra*, 13 Cal.App.4th at p. 1600.) Accordingly, the trial court erred in granting Standard Pacific's motion for summary adjudication of the breach of contract cause of action.

> 4. *Triable issues of material fact precluded summary adjudication of the second cause of action for breach of the implied covenant of good faith and fair dealing**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . But . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1410.

## DISPOSITION

The judgment is reversed. Standard Pacific shall bear the cost of appeal.

Klein, P. J., and Kitching, J., concurred.

Respondent's petition for review by the Supreme Court was denied January 13, 2010, S177798. Kennard, J., was of the opinion that the petition should be granted.