Filed 10/29/13  Lodging Property Brokers v. Chang CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LODGING PROPERTY BROKERS, INC.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JANE CHANG,<br><br>    Defendant and Respondent. | A136190<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-11-508930) |

Lodging Property Brokers, Inc. (LPB) sued Jane Chang to recover a real estate commission.[1]  After a bench trial, the trial court concluded that Jane did not owe LPB any money.  Judgment and an order awarding attorney fees were entered in Jane's favor.  LPB appeals.  We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Before December 17, 2010, the real property located at 700 Eddy Street, in San Francisco (the Property), was co-owned by Jane and Grace (the Changs), Harry P. Vance, John M. Vance III, Evelyn Peralta Ley-Coleman, William Vance Ley, the successor trustees of the 1995 Amelia Vance Ley Trust, Patricia A. Briggs, and Nancy J. Evans-Sundberg.  The Changs collectively owned a 50 percent interest, while the remaining owners (collectively the Vance heirs) owned the remaining 50 percent interest.  In addition, the Changs operated the Red Coach Motor Inn on the Property, under a written

---

[1] Because respondent and her sister, Grace Chang, share the same last name, we will refer to each by first name only.  No disrespect is intended.

lease agreement. Under the lease, the Changs had a right of first refusal to buy the other owners' interests. Specifically, the lease provides: "In the event the lessor receives a bona-fide offer to purchase the demised property at any time during the lease period, which offer is acceptable to lessor, then lessee shall have the right of refusal to purchase the demised property *on the same terms and conditions as contained in said offer . . . .*" (Italics added.)

The Changs sought to buy the Vance heirs' collective interest. The Vance heirs also made offers to buy out the Changs. Unable to agree, some of the Vance heirs filed a partition action in 2008. The Changs and the Vance heirs settled the partition action pursuant to a written settlement agreement. The settlement agreement contained procedures and terms for listing the Property, bids by the Vance heirs, and the Changs' exercise of their first refusal right (the Sales Protocol).

Under the Sales Protocol, the Vance heirs and the Changs agreed to form a three-person management committee, composed of two of the Vance heirs and Jane, to act on behalf of all the owners. The management committee was directed to solicit proposals from real estate brokers, and select a real estate broker to solicit offers for the Property. The Sales Protocol provides: "If the Changs exercise the Right of First Refusal, the purchase of the . . . Property shall close within thirty (30) days from the exercise thereof by the Changs, and the Changs shall be credited with fifty [percent] (50%) of the required sales price[], with the effect that the Changs shall only be obligated to pay 50% of the sales price in the offer subject to the Right of First Refusal to the Parties whose interests are being acquired."

The Changs' counsel prepared a request for proposals for listing the property, as well as a draft listing agreement, which was forwarded to LPB. John Richard Lopez is a licensed real estate broker who owns and operates LPB. Lopez responded with LPB's standard form listing agreement, which provided, in part: "Compensation to LPB: Owner agrees to pay LPB as compensation for services irrespective of agency relationship(s): 5% of the listed or selling price (whichever is applicable) for a

2

cooperative sale with another qualified broker, or 4% if LPB sells the property to a buyer; or 3% if the Chang's [*sic*] exercise their first right of refusal option."

The Changs and Vance heirs accepted LPB's commission schedule. However, the Changs demanded other modifications to the contract. Most important among these modifications, the Changs demanded that LPB eliminate the provision in LPB's standard form that would require the owners to pay a commission if LPB merely procured a ready, willing, and able buyer. LPB agreed to this change, and deleted this provision from the contract.

In August 2010, the representatives of the Vance heirs and Jane signed an exclusive authorization to sell (the Listing Agreement) with LPB. The Listing Agreement sets forth three conditions under which LPB may earn a commission. Specifically, section 1 of the Listing Agreement provides in relevant part: "Owner shall pay a sales commission ('commission'), and the commission shall be deemed earned only upon the occurrence of any of the following: [¶] A. If the property is sold, exchanged, or otherwise transferred during the above listing period or any written extension, by owners, or through any other source. [¶] B. If the property is withdrawn from sale . . . or made unmarketable by owner's voluntary act during the above listing period. [¶] C. If an agreement to sell or exchange the property is made by owner within one hundred eighty (180) days after the termination of this agreement to persons with whom [LPB] has had contact or negotiations during the listing period . . . ."

LPB's commission schedule reads as follows: "5% of the listed or selling price (whichever is applicable) for a cooperative sale with another qualified broker, or 4% if LPB sells the property to a buyer, or 3% if the Chang's [*sic*] exercise their first right of refusal option." (Underlining omitted.) The Changs and Lopez did not otherwise discuss the meaning of the term "selling price" before executing the Listing Agreement. However, both Lopez and Jane understood the general custom and practice in the industry to be that sellers, not buyers, pay real estate commission.

The Listing Agreement also provides: "In any action, proceeding, or arbitration between owner and LPB regarding the obligation to pay compensation under this

3

agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs. [¶] . . . [¶] This document contains the entire agreement of the owner and LPB and supersedes all prior agreements or representations . . . . [¶] . . . [¶] [LPB] acknowledges the property is encumbered by a lease that expires on September 30, 2016, with some of the owners in the sale of the property hereinafter known as Chang.  The sale will be subject to their rights of the lease agreement.  The Chang's [*sic*] additionally have rights as described . . . below. [¶] [LPB] acknowledges the lease has a first right of refusal (FRR) with respect to a bona-fide offer to purchase the property acceptable to the owners. [LPB] will disclose the FRR to all prospective purchasers that the lease has fifteen (15) days from the expiration of any due diligence period and the removal of any contingencies to exercise the FRR."

LPB obtained a third party offer from Anish Khimani to purchase 100 percent of the fee interest, subject to the lease, for $2.65 million.  The Khimani offer was accepted. On November 17, 2010, the Changs exercised their option to buy the Vance heirs' interests for half this amount, $1.325 million.  The letter of exercise provides:  "This letter, effective November 18, 2010, evidences the exercise by [the Changs] . . . of the right of first refusal contained in the lease to purchase the subject property on the terms of that certain Standard Commercial/Investment Purchase Agreement dated October 31, 2010 (the 'Purchase Agreement') with [Khimani], as Buyer, *for the purchase price of $2,650,000.00*. [¶] Pursuant to the [settlement agreement], . . . the Changs have this date deposited . . . the sum of $132,500.00, as the earnest money deposit under the Purchase Agreement.  In accordance with the Sales Protocol, [the Changs] shall be credited with 50% of the sale price, with the effect that the purchase price payable by the Changs at the closing shall be $1,325,000.00."  (Italics added.)

In escrow, the Vance heirs paid LPB a commission equal to three percent of the amount paid by the Changs ($1.325 million)—$39,750.  Prior to the close of escrow, LPB demanded the Changs also pay it $39,750.  The Changs refused and LPB sued Jane for breach of contract.

4

Following the submission of evidence at a bench trial, the trial court issued a statement of decision in favor of Jane. The court found that the Listing Agreement was jointly drafted by Lopez and the Changs' attorney. The court construed the commission schedule to provide for payment to Broker of " '3% of the selling price if the Chang's [*sic*] exercise their first right of refusal option.' " The trial court concluded that the plain language of the Listing Agreement required a commission payment of three percent of $1.325 million, which is the amount the sellers (the Vance heirs) were actually paid. The court rejected LPB's argument that it must read "selling price" in the Listing Agreement as incorporating the full amount of the Khimani offer. The court concluded: "[T]here is no showing that the parties here intended to be bound by any terms in any other document, and certainly not documents to be created in the future by non-parties." The court considered extrinsic evidence offered by both parties, and found that none of the extrinsic evidence supported a different interpretation. Judgment was entered for Jane and the trial court awarded costs and attorney fees. LPB filed a timely notice of appeal.

## II. DISCUSSION

The Listing Agreement provides three triggers for payment of the sales commission: "A. If the property is sold, exchanged, or otherwise transferred during the above listing period or any written extension, by owners, or through any other source. [¶] B. If the property is withdrawn from sale . . . or made unmarketable by owner's voluntary act during the above listing period. [¶] C. If an agreement to sell or exchange the property is made by owner within one hundred eighty (180) days after the termination of this agreement to persons with whom [LPB] has had contact or negotiations during the listing period . . . .". The parties agree that LPB's commission is based on the "listed price" under condition B (withdrawn from market) and on the "selling price" under conditions A and C (sale). They also agree that condition A applies here. The commission schedule clearly contemplates a three percent commission if the Changs exercise their right of first refusal. The disputed question is: What "selling price" applied when the Changs exercised their right of first refusal and purchased only the Vance heirs' fractional interests in the property?

5

LPB contends that the court erred when it concluded that LPB was owed only three percent of $1.325 million rather than three percent of $2.65 million. LPB claims that "selling price" means the purchase price offered by Khimani. LPB also contends that it is entitled to a commission of $79,500 because Lopez produced a buyer who was ready, able, and willing to purchase the entire property for $2.65 million. Jane, on the other hand, contends that "selling price" means the actual amount paid by the Changs. She also asserts that she had no obligation to pay LPB a commission because she did not sell her property and because the provision requiring payment of a commission upon procurement of a "ready, willing and able buyer" was removed from the Listing Agreement.

A broker's right to be paid a commission is determined by the terms of his or her contract, and the seller and broker may provide that no commission shall be earned until the occurrence of a specified event or condition. (*Seck v. Foulks* (1972) 25 Cal.App.3d 556, 571.) "It has long been the law of this state that any right to compensation asserted by a real estate broker must be found within the four corners of his employment contract. [Citations.] By the same token, however, '[the] parties to a broker's contract for the sale of real property are at liberty to make the compensation depend upon any lawful conditions they see fit to place therein. [Citations.]' [Citation.] In short it is the *contract* which governs the agent's compensation, and that contract is strictly enforced according to its lawful terms." (*Blank v. Borden* (1974) 11 Cal.3d 963, 969; accord, *Steve Schmidt & Co. v. Berry* (1986) 183 Cal.App.3d 1299, 1305.)

"The interpretation of a written instrument is solely a judicial function unless the interpretation turns upon the credibility of extrinsic evidence. We are not ' "bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation]." [Citations.]' [Citation.]" (*RC Royal Development & Realty Corp. v. Standard Pacific Corp.* (2009) 177 Cal.App.4th 1410, 1418.)

6

Here, although Lopez and Jane's counsel testified to differing undisclosed interpretations of the Listing Agreement, there is actually no conflict in the relevant extrinsic evidence regarding the intention of the parties. "California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation' [citation.]. The parties' undisclosed intent or understanding is irrelevant to contract interpretation. [Citations.]" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.) For this reason, we disregard the testimony regarding the parties' undisclosed understandings, as did the trial court. Because this leaves no conflict in the extrinsic evidence, we interpret the Listing Agreement de novo. (*RC Royal Development & Realty Corp. v. Standard Pacific Corp., supra,* 177 Cal.App.4th at p. 1418; *Steve Schmidt & Co. v. Berry, supra,* 183 Cal.App.3d at p. 1309.)

First, LPB contends that it is entitled to a commission of $79,500 because Lopez produced a buyer who was ready, able, and willing to purchase the entire property for $2.65 million. LPB insists that it is entitled to three percent of $2.65 million because "[t]he parties executed a listing agreement (per [*Steve Schmidt & Co. v. Berry, supra,* 183 Cal.App.3d 1299]) and [LPB] produced a buyer with a signed purchase-sale agreement (per *Austin v. Richards* (1956) 146 Cal.App.2d 436]) and [the Changs] exercised their right to purchase the property on the terms and conditions of the third party contract under a right of first refusal . . . . [¶] . . . [¶] The trial court misunderstood that the purpose of broker agreements is to obtain a purchaser for property and, upon securing a buyer, the broker is entitled to be paid a commission based upon a percentage of the purchase price obtained."

Even assuming that LPB has not forfeited this argument by failing to raise it before the trial court, LPB has shown no error. "A common type of listing agreement is one . . . wherein the broker agrees to produce a buyer ready, willing and able to purchase the described property on the terms and conditions set forth in the listing and the seller agrees to accept the offer on the terms set forth in the agreement. Under such an

7

agreement, it is well settled the broker's commission is earned upon the production of a ready, willing and able buyer." (*Steve Schmidt & Co. v. Berry, supra,* 183 Cal.App.3d at p. 1305.) Generally, "where the contract fixes the broker's right to remuneration upon his sale, if he shall produce a purchaser able and willing to buy, he has performed his part of the contract, and the owner's liability for his compensation or commission is complete, and cannot be avoided by any arbitrary or wanton refusal to consummate the sale. [Citations.]" (*Merriman v. Wickersham* (1904) 141 Cal. 567, 570.) " 'The broker has performed his duty and has earned his commission regardless of whether a written contract is actually entered into or whether the sale is ever consummated by the delivery of the property and the payment of the purchase price.' [Citations.]" (*Coulter v. Howard* (1927) 203 Cal. 17, 25–26.)

But, "[t]he contents of a listing agreement, not its label, determine the parties' rights. [Citation.]" (*Howard Gitlen & Associates, Inc. v. Ameri* (1989) 208 Cal.App.3d 90, 95.) LPB concedes that, "[i]n entering into the listing agreement . . . , [Jane] was free to condition her obligation to pay commissions—or not pay them at all if . . . she exercised her right of first refusal."

LPB's reliance on *Steve Schmidt & Co. v. Berry, supra,* 183 Cal.App.3d 1299, *Austin v. Richards, supra,* 146 Cal.App.2d 436, and *McNamara v. Steckman* (1927) 202 Cal. 569 is misplaced. These cases merely illustrate the following rule: "*In the absence of some specific terms and conditions*, a sales listing requires the broker to obtain a ready, willing and able purchaser or the actual execution of a contract by the seller in order for the commission to be earned, and the only conditions are that a ready, willing and able purchaser be found or that a contract of sale actually be executed. The more common practice in modern listing agreements is for the terms of the listing to be more precise and complete in specifying when and under what conditions the commission is earned and payable." (2 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 5.42, p. 5-159, italics added & fn. omitted.) Unlike any of the cases relied on by LPB, the listing agreement involved herein *does* include specific conditions for payment of a commission—sale or withdrawal from sale. These conditions do not include the broker's

8

production of a ready, willing and able buyer. (*McNamara v. Steckman,* at p. 571; *Steve Schmidt & Co. v. Berry, supra,* 183 Cal.App.3d at pp. 1303–1305, 1309; *Austin v. Richards, supra,* 146 Cal.App.2d at pp. 437, 440.) In fact, the parties deleted that condition during negotiation of the Listing Agreement.

*Matthews v. Starritt* (1967) 252 Cal.App.2d 884 demonstrates how parties may vary the terms of a listing agreement to deal with the unique situation presented by a right of first refusal. In that case, a real estate broker sought recovery of a commission under an exclusive listing agreement. (*Id.* at p. 885.) Prior to signing the agreement, the seller informed the broker that one of the tenants on the property had an option to purchase the property. The listing agreement, signed thereafter, provided for a commission equal to five percent of the selling price and that "the sale was subject to the existing leases and also s*ubject to the refusal of the purchase price by* [*the tenant*] within 20 days." (*Id.* at p. 886 & fn. 1, italics added.) There was no further discussion between the seller and broker regarding the broker's right to commission in the event the tenant exercised its option. (*Id.* at p. 886.)

After the tenant exercised its option to purchase the property, a dispute arose regarding the broker's right to a commission. (*Matthews v. Starritt, supra,* 252 Cal.App.2d. at pp. 886–887.) The reviewing court concluded that the italicized language constituted a condition precedent to the broker's entitlement to a commission. (*Id.* at p. 888.) The court also rejected the broker's argument that he was entitled to a commission because he secured a purchaser and those services effected the sale to the tenant. The court observed: "The [ready, able, and willing buyer] cases have no application to the instant situation where the agreement to sell and, therefore, the broker's commission is expressly made conditional. [Citation.] Acceptance of a conditional deal procured and presented by the broker does not give him a right to commission unless and until the condition is performed. [Citation.] [¶] . . . [I]f [the broker] had wished to protect his right to a commission in this situation, he should have expressly inserted an appropriate statement . . . that he was entitled to a commission even though [the tenant] exercised its option." (*Id.* at pp. 888–889.)

In this case, the Listing Agreement similarly provides that "[t]he sale will be subject to [the Changs'] rights of the lease agreement," which include the right of first refusal. But, the Listing Agreement also included a statement that LPB was entitled to a commission even if the Changs exercised their option. *Matthews v. Starritt, supra,* 252 Cal.App.2d 884 does not address such a situation.

Even if the Listing Agreement as a whole is ambiguous—because the commission schedule provides for a commission of three percent if the Changs exercise their right of first refusal—we are not compelled to conclude that LPB's interpretation controls. We agree with the trial court that the plain meaning of "selling price" is "the price actually paid" when the property is sold. And, even if we were to agree with LPB's assumption that "selling price" is ambiguous in the context presented here—where a co-owner who is also a tenant exercises its right of first refusal to buy out the remaining owners' fractional interest—LPB has not presented any reason, under routine contract interpretation principles, that its interpretation, rather than that supported by real estate custom and the "subject to" clause, should prevail.[2]

"A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone. [Citations.] We may not 'create for the parties a contract which they did not make, and . . . cannot insert in the contract language which one of the parties now wishes were there. [Citation.]" (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 473.) "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.)[3]

---

[2] Both Lopez and Jane understood the general custom and practice in the industry to be that sellers, not buyers (as the Changs were here), pay the real estate commission. (See *Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1244 [industry custom properly considered in contract interpretation].)

[3] All further statutory references are to the Civil Code.

"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (§ 1638.)

" 'When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the party. If it is not, the case is over. [Citation.] If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean?' [Citations.] Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself or from extrinsic evidence of the parties' intent. [Citation.] Extrinsic evidence can include the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.] When no extrinsic evidence is introduced or the extrinsic evidence was not relied on by the trial court or is not in conflict, we independently construe the contract. [Citation.]" (*Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 979–980.)

If ambiguity exists, we rely on the rules of contract interpretation to resolve the ambiguity. (§ 1637.) "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (§ 1644.) "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (§ 1647.) "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (§ 1649.) "Furthermore, in case of an ambiguity, the contract should be construed most strongly against the party who drafted or supplied it. [Citations.] Thus, where a listing agreement is prepared by a broker, . . . any uncertainty in the provisions therein relating to the commission should be construed in favor of the seller." (*Matthews v. Starritt, supra,* 252 Cal.App.2d at p. 887.)

11

LPB primarily seeks to support its interpretation of the Listing Agreement by arguing that it incorporated the sales price ultimately offered and accepted for the entire Property. LPB contends: "Most significantly, there was only one purchase-sale agreement generated in this transaction: The Khimani Contract. When [Jane] exercised [the] Right of First Refusal, she did so under the terms, rights and obligations set forth in the Khimani Contract." LPB insists that "the trial court should have properly viewed [the Khimani Offer] as the necessary condition precedent in the performance of the parties [*sic*] obligations (and entitlements) to receiving a commission." "A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." (§ 1436.)

As noted *ante*, the Listing Agreement and extrinsic evidence of negotiations between the parties make clear that *sale* of the Property, rather than simply procurement of the Khimani Offer, was the condition precedent to LPB earning a commission. And, we agree with the trial court that the parties did not incorporate either the Khimani Offer, the Lease, or the Changs' notice of exercise of the right of first refusal into the Listing Agreement. "[T]o have a valid incorporation by reference, the terms of the document being incorporated must be ' " 'known or easily available' " ' to the contracting parties. [Citation.]" (*Gilbert Street Developers, LLC v. La Quinta Homes, LLC* (2009) 174 Cal.App.4th 1185, 1194.) "Most basically, what is being incorporated must *actually exist at the time of the incorporation*, so the parties can know exactly what they are incorporating. [Citation.]" (*Ibid.*) LPB suggests, without any authority to support the assertion, that this contract principle does not apply to the type of contract at issue here. LPB suggests that later-created documents must be incorporated by reference into listing agreements because "EVERY broker listing agreement involves the setting of a commission based upon the precise requirement that commissions are tied to the payment of a percentage of a future—not-yet-obtained—sales agreement between an as-yet unknown, unidentified buyer at a price not yet set." We are not persuaded. LPB's argument equally supports "the price actually paid" interpretation. Furthermore,

12

accepting LPB's argument would contradict the terms of the Listing Agreement, which includes an integration clause.

The implied covenant of good faith and fair dealing does not assist LPB's cause. "[E]very contract has an implied covenant not to do anything which injures the right of the other party to receive the benefits of the agreement. [Citation.]" (*Torelli v. J. P. Enterprises, Inc.* (1997) 52 Cal.App.4th 1250, 1257.) However, the problem here is that LPB seeks to obtain more than the Listing Agreement provides. The implied covenant cannot assist it in this endeavor.

The trial court did not err in concluding LPB was not entitled to any further commission. Accordingly, we need not address LPB's argument that the trial court's award of attorney fees must be reversed with reversal of the judgment.[4]

### III. DISPOSITION

The judgment is affirmed. Respondent is to recover her costs on appeal.

_____

Bruiniers, J.

We concur:

_____

Simons, Acting P. J.

_____

Needham, J.

---

[4] We also need not address LPB's argument that the parties' conduct, prior to the commission dispute arising, supports its interpretation of the Listing Agreement. In its opening brief, LPB only raises this issue in passing and does not include any reasoned analysis of how Jane's conduct demonstrates an intent to pay commission based on the third party offer for the entire Property. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [if no legal argument with citation to authority " 'is furnished on a particular point, the court may treat it as waived, and pass it without consideration' "]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [when an appellant raises an issue "but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)